## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA

AMERICA'S HEALTH INSURANCE
PLANS,

               Plaintiff,

    v.

RALPH T. HUDGENS, in his official
capacity as Georgia Insurance and
Safety Fire Commissioner,

               Defendant.

Civil Action No. _____

## COMPLAINT AND PRAYER FOR DECLARATORY
## AND INJUNCTIVE RELIEF

Plaintiff America's Health Insurance Plans ("AHIP") files this Complaint for declaratory and injunctive relief to prevent Defendant Ralph T. Hudgens, in his official capacity as Georgia Insurance and Safety Fire Commissioner ("Commissioner"), from giving effect to or enforcing amendments to the State of Georgia's "prompt pay" statute that are preempted by federal law, the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq*. ("ERISA").

AHIP hereby alleges as follows:

## I.
## PRELIMINARY STATEMENT

1.      Under the Insurance Delivery Enhancement Act of 2011, the State of Georgia amended its prompt pay statue, which generally requires Georgia

"insurers" to pay health benefits claims within specified time periods.  Through these new provisions, which are referred to herein collectively as the "Prompt Pay Amendment," Georgia's prompt pay requirements will be extended for the first time—effective January 1, 2013—to self-funded health benefit plans and the administrators acting on their behalf.  These plans are governed exclusively by ERISA.  A copy of the Prompt Pay Amendment is attached hereto as Exhibit A.

2.     ERISA is a comprehensive, federal statutory framework governing employer-sponsored health benefit plans.  Along with numerous federal statutory and regulatory provisions governing the administration of these plans, section 514 of ERISA expressly preempts state laws that "relate to" these plans, 29 U.S.C. § 1144(a), subject to certain exceptions that do not apply here.  State laws affecting administration of self-funded ERISA plans, like the Prompt Pay Amendment, are preempted by ERISA, because subjecting them to "differing state regulations would complicate the administration of nationwide plans."  *FMC Corp. v. Holliday*, 498 U.S. 52, 60 (1990); *see also Egelhoff v. Egelhoff*, 532 U.S. 141, 149 (2001) ("Requiring ERISA administrators to master the relevant laws of 50 States and to contend with litigation would undermine the congressional goal of 'minimiz[ing] the administrative and financial burden[s]' on plan administrators."

(alterations in original) (quoting *Ingersoll-Rand Co.* v. *McClendon,* 498 U.S. 133, 142 (1990))).

3.      The Prompt Pay Amendment unquestionably "relate[s] to" the administration of self-funded ERISA plans and therefore is preempted, because it affects a core function of plan administration:  the processing of claims for plan benefits.  Moreover, the Prompt Pay Amendment presents exactly the type of state regulation that, if it were not preempted, would increase the cost and complexity of administering these plans, directly at odds with the intended purpose of ERISA and its preemption provisions.

4.      The Prompt Pay Amendment also is independently preempted because it poses a direct conflict with ERISA's civil enforcement mechanism, section 502, 29 U.S.C. § 1132, which sets forth the exclusive remedies for improper or untimely processing of benefit claims.

5.      The Prompt Pay Amendment is also independently preempted by health benefit claims-processing regulations adopted by the U.S. Department of Labor ("DOL") pursuant to section 503 of ERISA.  29 U.S.C. § 1133.  In 2000, the DOL, as the primary federal regulator under ERISA, adopted regulations to impose uniform *federal* procedures and timelines on ERISA plans regarding the processing of health benefit claims.  29 C.F.R. § 2560.503-1.  In so doing, the DOL stated that

3

the regulations were intended to "increase confidence in the employment-based health benefits system . . . and help streamline and make more uniform and predictable claims and appeals procedures." *Rules and Regulations for Administration and Enforcement; Claims Procedure*, 65 Fed. Reg. 70,246, 70,259 (Nov. 21, 2000).

6.      Directly at odds with this federal framework, Georgia now seeks to impose on self-funded ERISA plans claims-processing standards and timelines that differ in a number of respects from those set forth in the DOL regulations.  For example, the DOL regulations provide plans with 30 days to notify claimants of adverse benefit determinations and an additional 15 days if plans determine that an extension is necessary and give proper notice to the claimant of the reason for the extension.  The Prompt Pay Amendment requires that plans process and pay electronic claims within 15 business days and paper claims within 30 calendar days and does not provide for any extension of those deadlines.

7.      Because the Prompt Pay Amendment is preempted by ERISA—a fact that Georgia's previous governor explicitly recognized when he vetoed a law nearly identical to the Prompt Payment Amendment in 2010—AHIP seeks an injunction preventing the Commissioner from giving effect to or enforcing the Prompt Pay Amendment with respect to self-funded ERISA plans and third-party

4

administrators acting on their behalf, along with declaratory relief and other appropriate remedies.

## II.
## <u>JURISDICTION AND VENUE</u>

8.      This Court has jurisdiction over the subject matter of this suit pursuant to 28 U.S.C. § 1331, because the case raises questions arising under ERISA, a federal law.  *See Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 n.14 (1983).  AHIP seeks a declaration of its rights in this case of actual controversy within the Court's jurisdiction pursuant to 28 U.S.C. §§ 2201-2202.

9.      This Court also has diversity jurisdiction over the subject matter of this suit pursuant to 28 U.S.C. § 1332.  Plaintiff AHIP is incorporated in Delaware and has its principal place of business in Washington, D.C.; Defendant Ralph T. Hudgens, the Commissioner, is a citizen of the State of Georgia, and the amount in controversy exceeds $75,000.

10.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the Commissioner is a government official who performs his official duties in this judicial district and because substantial parts of the events giving rise to AHIP's claims have occurred in this judicial district.

### III.
### PARTIES

11.      AHIP is a national trade association that represents companies that provide administrative services to self-funded plans and that provide health insurance to insured employee benefit plans.  AHIP's members provide health and supplemental benefits to more than 200 million Americans through employer-sponsored coverage, the individual insurance market, and public programs such as Medicare and Medicaid.  AHIP advocates for public policies that expand access to affordable health care coverage to all Americans through a competitive marketplace that fosters choice, quality, and innovation.

12.      AHIP's members include companies that provide administrative services, including claims processing, to self-funded ERISA plans.  Some of AHIP's members also have their own self-funded ERISA plans.  These plans historically have been exempt from Georgia's prompt pay requirements.  If the Prompt Pay Amendment is allowed to become effective on January 1, 2013, however, it will extend Georgia's prompt pay and other regulatory requirements for the first time to these self-funded ERISA plans, and thereby increase the cost and regulatory burden associated with administering them.

13.      As administrators for many self-funded ERISA plans, AHIP's members will be injured if the Prompt Pay Amendment is allowed to become

effective on January 1, 2013.  The Prompt Pay Amendment will require self-funded ERISA plans and administrators acting on their behalf to change their plan administration, resulting in increased costs and burdens to these plans and their administrators.

14.     By way of example, if the Prompt Pay Amendment is allowed to become effective, AHIP's members administering self-funded ERISA plans will need to modify their claims systems and processes so that they can identify the claims under self-funded ERISA plans that now will be subject to Georgia's expanded prompt pay requirements, pay those claims within the specified time periods (which differ depending on whether the claims are submitted electronically or on paper), and calculate and pay interest for any late claim payments.

15.     In addition, beginning on January 1, 2013 and on an on-going basis thereafter, AHIP's members will need to monitor compliance with the Prompt Pay Amendment for the numerous claims that now will be subject to its prompt pay requirements.  AHIP's members also will need to provide various quarterly reports to the Commissioner regarding compliance with the Prompt Pay Amendment and face potential fines, depending on the results reflected in those reports.

16.     These injuries are directly and immediately traceable to provisions in the Prompt Pay Amendment that are preempted by ERISA, and they would be

remedied by a judgment enjoining the Commissioner from giving them effect or enforcing them, and declaring that ERISA preempts them and renders them unenforceable.

17.     AHIP's members have standing to challenge the lawfulness of the Prompt Pay Amendment:  the interests AHIP seeks to vindicate in this litigation are germane to its interests as a trade association; and AHIP seeks only declaratory and injunctive relief.  Thus, neither the claims asserted nor the relief requested requires the participation of individual AHIP members in the lawsuit.

18.     Defendant Ralph T. Hudgens, located at Two Martin Luther King, Jr. Drive, West Tower, Suite 704, Atlanta, Georgia 30334, is the Georgia Insurance and Safety Fire Commissioner.  The Commissioner is sued in his official capacity because he is the state official with ultimate responsibility for administering and enforcing provisions of the Prompt Pay Amendment.  *See* O.C.G.A. §§ 33-2-24, 33-24-59.5(d), 33-24-59.14(d).  The relief requested in this action is sought against the Commissioner, as well as against any subordinate officers, employees, agents, and other persons acting in cooperation with him, under his supervision, at his direction, or under his control.  The Commissioner is a citizen of the State of Georgia.

**IV.**
**FACTS**

19.     By extending Georgia's prompt pay requirements to self-funded

ERISA plans, which are governed exclusively by ERISA, the Prompt Pay

Amendment is contrary to well-established principles of ERISA preemption.

20.     Generally, there are two types of funding arrangements for ERISA

plans: (1) "insured" plans for which employers obtain insurance and the insurers

are financially responsible for paying health benefits, and (2) "self-funded" (or

"self-insured") plans for which employers do not obtain insurance and thus are

financially responsible for paying benefits themselves (or, in the case of some

labor organizations, through assets contributed by the labor organization to a trust).

Although ERISA applies to both types of plans, Congress adopted the "deemer

clause," 29 U.S.C. § 1144(b)(2)(B), to make clear that self-funded plans cannot be

regulated by state law.  Applying this framework, the United States Supreme Court

has ruled that "if a plan is insured, a State may regulate it indirectly through

regulation of its insurer and its insurer's insurance contracts; if the plan is

uninsured [*i.e.*, self-funded], ***the State may not regulate it***."  *FMC Corp.*, 498 U.S.

at 64 (emphasis added).

21.     Since the State of Georgia originally enacted its prompt pay statute in 1999, it has applied to "insurer[s]," and not self-funded ERISA plans and their administrators.  *See* O.C.G.A. § 33-24-59.5(a)(3).

22.     Notably, just two years ago, the Georgia General Assembly passed HB 321, which contained provisions substantially similar to the Prompt Pay Amendment at issue in this case, including a provision deleting the exemption for self-funded ERISA plans.  A copy of HB 321 is attached hereto as Exhibit B.

23.     When presented with HB 321 in June 2010, then-Governor Perdue vetoed it.  In a press release explaining the veto, then-Governor Perdue stated that he was compelled to do so because the bill's supporters had insisted, "over the objections of many," on including "language [in the bill] that likely violates [ERISA], a federal law that preempts portions of HB 321 as written."  Out of respect for "the Supremacy Clause of the United States Constitution" then-Governor Perdue refused to "sign a bill that contravene[d] ERISA."  Press Release, Governor Sonny Perdue, Governor Perdue Signs Bill Clarifying Georgia's Gun Laws (June 8, 2010), *available at* http://gov.georgia.gov/00/press/detail/ 0,2668,78006749_160096907_160291947,00.html.  A copy of the press release explaining then-Governor Perdue's veto of HB 321 is attached as Exhibit C.

24.     Just a few months later, HB 167, the Insurance Delivery Enhancement Act of 2011, was introduced in the General Assembly.  Even though HB 167 raised the same ERISA preemption issues as the previous bill, the Georgia General Assembly passed it.

25.     On May 12, 2011, Governor Deal signed HB 167 into law.

26.     The following sections of the Prompt Pay Amendment purport to sweep self-funded ERISA plans within the scope of Georgia's prompt pay requirements and other regulations—and are therefore preempted.

27.     Section 4 amends various definitions and licensing requirements under O.C.G.A. § 33-23-100 in ways that purport to subject administrators of self-funded ERISA plans to increased regulation by the State of Georgia.  By way of example, section 4 adds business entities that act on behalf of single employer self-insurance health plans to its definition of the term "[a]dministrator."  Because of these amendments, administrators of self-funded ERISA plans now will be subject to various regulations enforced by the Commissioner.  *See* O.C.G.A. §§ 33-23-101, 33-23-102, 33-23-103.

28.     Sections 5 and 6 expand Georgia's prompt pay requirements to cover self-funded ERISA plans.  In particular, section 5 amends section 33-24-59.5(b) of the Insurance Code—which imposes specific timelines for payment of

11

benefits "to the insured or other person claiming payments under the plan"—to include "self-insured plan[s]" and their "administrators" within its scope.  It accomplishes this by adding administrators of all types to that definition, and by including "self-insured plan[s]" in its definition of the term "[h]ealth benefit plan."

29.     As a result, section 5 subjects self-funded ERISA plans and their administrators to Georgia's prompt payment obligations, which have been modified to require insurers and administrators to process and pay paper claims within 30 calendar days and electronic claims within 15 business days, and to pay a 12 percent interest penalty on late-paid claims.[1]

30.     Section 5 also enacts a new section 33-24-59.5(d), which allows the Commissioner to collect data and impose new administrative penalties on "insurer[s]"—which, because of the other amendments, now would include self-funded ERISA plans—that process less than 95 percent of claims received in a standard financial quarter within the time limits set forth in the Prompt Pay Amendment.

---

[1]  As reflected in the Prayer for Relief, AHIP challenges the Prompt Pay Amendment insofar as it applies to self-funded ERISA plans and their administrators, which are not subject to Georgia's existing prompt pay statute. AHIP is not seeking to enjoin the Prompt Pay Amendment to the extent that some of its provisions (such as the change in interest rate to be paid on late claims, or the number of days to pay paper claims) apply to insurers and non-ERISA plans, which are already subject to Georgia's existing prompt pay statute.

31.     Section 6, which adds section 33-24-59.14 to the Insurance Code, is similar to section 5, but requires payments within specified time periods "to the facility or health care provider claiming payments under the plan," rather than to the insured or other person claiming such payments.

32.     Section 7(b) of the Prompt Pay Amendment provides that sections 4, 5, and 6 of the Prompt Pay Amendment become effective on January 1, 2013.

## V.
## CLAIMS FOR RELIEF

### COUNT I
### DECLARATORY RELIEF:
### EXPRESS PREEMPTION UNDER SECTION 514 OF ERISA

33.     AHIP repeats and realleges each and every allegation contained in the above paragraphs as if fully set forth herein.

34.     ERISA was enacted in 1974 to establish a uniform national framework for sponsoring, administering, protecting, and regulating employee benefit plans, including health and welfare plans.  In order to foster uniform national standards for administration of these plans, ERISA expressly preempts state and local laws that "relate to" employee benefit plans.  29 U.S.C. § 1144(a).

35.     The Prompt Pay Amendment does not qualify under the so-called saving clause, which exempts state laws that "regulate[] insurance" from the preemptive reach of section 514.  29 U.S.C. § 1144(b)(2)(A)-(B).

13

36.     Sections 4, 5, and 6 of the Prompt Pay Amendment (amending O.C.G.A. §§ 33-23-100 and 33-24-59.5 of the Georgia Code and adding section 33-24-59.14), as applied to self-funded ERISA plans and their administrators, conflict with ERISA's carefully constructed federal framework and are expressly preempted by section 514 of ERISA, 29 U.S.C. § 1144(a), because they "relate to" ERISA-covered plans and have an impermissible connection with and reference to such plans.  Specifically, these provisions improperly impose claims-processing time limitations, administrative and interest penalties, and other regulatory requirements on self-funded ERISA plans and their administrators.  The provisions of Georgia law challenged in this lawsuit purposely and directly operate with respect to payments that administrators make on behalf of self-funded ERISA plans to beneficiaries and others claiming payments under the plans' terms.

37.     Allowing Georgia to proceed down this path would give rise to exactly the kind of patchwork of state regulation that ERISA preemption is designed to prevent.

38.     Accordingly, pursuant to 28 U.S.C. § 2201, a declaration is necessary and appropriate to specify that sections 4, 5, and 6 of the Prompt Pay Amendment are preempted by Section 514 of ERISA and invalid as applied to self-funded ERISA plans and their administrators.

14

## COUNT II
## DECLARATORY RELIEF:
## CONFLICT PREEMPTION—DEPARTMENT OF LABOR
## ERISA REGULATIONS

39.     AHIP repeats and realleges each and every allegation contained in the above paragraphs as if fully set forth herein.

40.     The Supremacy Clause of the United States Constitution separately and independently preempts state laws that conflict with ERISA or operate to frustrate its objectives.

41.     Sections 4, 5, and 6 of the Prompt Pay Amendment (amending O.C.G.A. §§ 33-23-100 and 33-24-59.5 and adding section 33-24-59.14), as applied to self-funded ERISA plans and their administrators, conflict with and are preempted by ERISA because they impermissibly interfere with the uniform, national administration of health benefit plans that ERISA seeks to establish, including federal claims-processing regulations set forth at 29 C.F.R. § 2560.503-1, which establish timelines different than those in the Prompt Pay Amendment.

42.     The Prompt Pay Amendment would conflict with ERISA by imposing on ERISA-covered plans and their administrators claims-processing obligations that are unique to Georgia.  Thus, the statutory provisions challenged in this lawsuit unlawfully compel ERISA-covered plans and their administrators to

handle and process claims in Georgia differently than do federal regulations governing such plans.

43.     Accordingly, pursuant to 28 U.S.C. § 2201, a declaration is necessary and appropriate to specify that sections 4, 5, and 6 of the Prompt Pay Amendment are in conflict with and preempted by federal ERISA regulations adopted by the Department of Labor and are invalid as applied to self-funded ERISA plans and their administrators.

**COUNT III**
**DECLARATORY RELIEF:**
**CONFLICT PREEMPTION—SECTION 502 OF ERISA**

44.     AHIP repeats and realleges each and every allegation contained in the above paragraphs as if fully set forth herein.

45.     The Supremacy Clause of the United States Constitution separately and independently preempts state laws that conflict with ERISA or operate to frustrate its objectives.

46.     The Prompt Pay Amendment, including the interest payments, data-collection, and enforcement provisions that sections 5 and 6 of the Prompt Pay Amendment add to O.G.C.A. §§ 33-24-59.5(d) and 33-24-59.14(d), conflicts with section 502 of ERISA, 29 U.S.C. § 1132(a), which is ERISA's exclusive, integrated civil enforcement mechanism.  Section 502 sets forth the exclusive

remedies available for challenging improper or untimely processing of claims under an ERISA plan.  Accordingly, the Prompt Pay Amendment is preempted to the extent that it provides additional remedies beyond those set forth in section 502.

47.      Allowing Georgia to proceed down this path would upset Congress's careful balancing of the need for prompt and fair claims-settlement procedures against the public interest in encouraging the formation of employee benefit plans.

48.      Accordingly, pursuant to 28 U.S.C. § 2201, a declaration is necessary and appropriate to specify that sections 4, 5, and 6 of the Prompt Pay Amendment are in conflict with and preempted by section 502 of ERISA and are invalid as applied to self-funded ERISA plans and their administrators.

<u>**COUNT IV**</u>
<u>**INJUNCTIVE RELIEF**</u>

49.      AHIP repeats and realleges each and every allegation contained in the above paragraphs as if fully set forth herein.

50.      Sections 4, 5, and 6 of the Prompt Pay Amendment (amending O.C.G.A. §§ 33-23-100 and 33-24-59.5 and adding section 33-24-59.14), as applied to self-funded ERISA plans and their administrators, will cause AHIP's members immediate injury for which there is no adequate remedy at law because

they (1) subject AHIP's members and the self-funded ERISA plans that they administer to a regulatory scheme that is inconsistent with and preempted by ERISA and its underlying regulations; (2) require that AHIP's members process claims for benefits within specific time periods not mandated by (and inconsistent with those established by) ERISA; (3) subject AHIP's members to interest payments, data-collection requirements, reporting obligations, and enforcement by the Commissioner pursuant to statutory terms that are inconsistent with and preempted by ERISA's exclusive civil enforcement mechanism; and (4) as detailed above, impose requirements that will increase AHIP's members' costs.

51.     These injuries are a direct result of the application of sections 4, 5, and 6 of the Prompt Pay Amendment to self-funded ERISA plans and their administrators, cannot be adequately compensated by money damages, and will be irreparable absent preliminary and permanent injunctive relief; accordingly, these injuries are redressable by the granting of appropriate injunctive relief preventing application of sections 4, 5, and 6 of the Prompt Pay Amendment to self-funded ERISA plans.

## **PRAYER FOR RELIEF**

WHEREFORE AHIP respectfully requests that this Court:

A.      Enter judgment in AHIP's favor;

B.      Permanently enjoin the Commissioner and his officers, agents, subordinates, and employees from giving effect to or enforcing sections 4, 5, and 6 of the Prompt Pay Amendment with respect to self-funded ERISA plans and their administrators;

C.      Declare that sections 4, 5, and 6 of the Prompt Pay Amendment, as applied to self-funded ERISA plans and their administrators, are preempted by ERISA;

D.      Declare any action taken by the Commissioner or his officers, agents, subordinates, and employees pursuant to sections 4, 5, and 6 of the Prompt Pay Amendment against self-funded ERISA plans and their administrators to be null and void;

E.      Issue all preliminary relief and process necessary and appropriate to prevent the Commissioner and his officers, agents, subordinates, and employees from taking any action pursuant to sections 4, 5, and 6 of the Prompt Pay Amendment against self-funded ERISA plans and their administrators pending the conclusion of this case;

F.      Award AHIP its costs and reasonable attorneys' fees as appropriate; and

G.      Grant such additional relief as the Court may deem appropriate.

19

Respectfully submitted,

Dated: August 28, 2012

Bruce P. Brown
bbrown@brucepbrownlaw.com
Georgia Bar No. 064460

BRUCE P. BROWN LAW LLC
309 N. Highland Avenue, Suite A
Atlanta, GA 30307
Telephone: 404.584.0400
Fax: 888.805.7688

*Additional counsel listed on the next page*

James A. Washburn
jwashburn@mckennalong.com
Georgia Bar No. 738845

McKENNA LONG & ALDRIDGE LLP
303 Peachtree Street, Suite 5300
Atlanta, GA  30308
Telephone: 404.527.4000
Fax: 404.527.4198

Miguel A. Estrada*
mestrada@gibsondunn.com
Geoffrey Sigler*
gsigler@gibsondunn.com
Nikesh Jindal*
njindal@gibsondunn.com

GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC  11101
Telephone: 202.955.8500
Fax: 202.467.0539

*Attorneys for Plaintiff America's Health
Insurance Plans*

*Applications for admission *pro hac vice*
to be submitted

# EXHIBIT C

11                                                                                   HB 167/AP

House Bill 167 (AS PASSED HOUSE AND SENATE)

By: Representatives Davis of the 109th, Maxwell of the 17th, Rogers of the 26th, Meadows of the 5th, Cooper of the 41st, and others


A BILL TO BE ENTITLED

AN ACT


1   To amend Title 33 of the Official Code of Georgia Annotated, relating to insurance, so as to
2   provide for changes in the definitions of the terms "group accident and sickness insurance"
3   and "true association"; to provide a short title; to provide certain definitions; to include plan
4   administrators in prompt pay requirements; to provide for penalties; to provide an effective
5   date; to provide for related matters; to repeal conflicting laws; and for other purposes.


6          BE IT ENACTED BY THE GENERAL ASSEMBLY OF GEORGIA:


7                              **SECTION 1.**
8   This Act shall be known and may be cited as the "Insurance Delivery Enhancement Act of
9   2011."


10                             **SECTION 2.**
11  Title 33 of the Official Code of Georgia Annotated, relating to insurance, is amended by
12  revising paragraphs (2) and (3) of subsection (a) of Code Section 33-30-1, relating to the
13  definition of "group accident and sickness insurance" and "true association," as follows:
14       "(2)  Under a policy issued to an association, including a labor union, which shall have
15       a constitution and bylaws and which has been organized and is maintained in good faith
16       for purposes other than that of obtaining insurance, insuring at least ~~25~~ ten members,
17       employees, or employees of members of the association for the benefit of persons other
18       than the association or its officers or trustees.  As used in this paragraph, the term
19       'employees' may include retired employees;
20       (3)  Under a policy issued to the trustees of a fund established by two or more employers
21       in the same industry, by one or more labor unions, by one or more employers and one or
22       more labor unions, or by an association, as defined in paragraph (2) of this Code section,
23       which trustees shall be deemed the policyholder, to insure not less than ~~25~~ ten employees
24       of the employers or members of the union or of such association or of members of such
25       association for the benefit of persons other than the employers or other unions or such

26    associations.  As used in this paragraph, the term 'employees' includes the officers,

27    managers, and employees of the employer and the individual proprietor or partners, if the

28    employer is an individual proprietor or partnership.  The term may include retired

29    employees.  The policy may provide that the term 'employees' shall include the trustees

30    or their employees, or both, if their duties are principally connected with such

31    trusteeship;"

32                      **SECTION 3.**

33    Said title is further amended by revising subparagraph (a)(7)(A) of said Code Section

34    33-30-1 as follows:

35    "(7)(A)  Under a policy issued to a legal entity providing a multiple employer welfare

36    arrangement, which means any employee benefit plan which is established or

37    maintained for the purpose of offering or providing accident and sickness benefits to

38    the employees of two or more employers, including self-employed individuals,

39    <u>individuals whose compensation is reported on federal Internal Revenue Service Form</u>

40    <u>1099,</u> and their <u>spouses or</u> dependents.  The term ~~does~~ <u>shall</u> not apply to any plan or

41    arrangement which is established or maintained by a tax-exempt rural electric

42    cooperative or a collective bargaining agreement."

43                      **SECTION 4.**

44    Said title is further amended by revising Code Section 33-23-100, relating to the definition

45    of administrator, as follows:

46    "33-23-100.

47    (a)  As used in this article, the term:

48    (1) 'Administrator' means any business entity that, directly or indirectly, collects charges,

49    fees, or premiums; adjusts or settles claims, including investigating or examining claims

50    or receiving, disbursing, handling, or otherwise being responsible for claim funds; ~~and~~

51    <u>or</u> provides underwriting or precertification and preauthorization of hospitalizations or

52    medical treatments for residents of this state for or on behalf of any insurer, including

53    business entities that act on behalf of <u>a single or</u> multiple employer self-insurance health

54    ~~plans, and~~ <u>plan or a</u> self-insured ~~municipalities~~ <u>municipality</u> or other political

55    ~~subdivisions~~ <u>subdivision</u>.  Licensure is also required for administrators who act on behalf

56    of self-insured plans providing workers' compensation benefits pursuant to Chapter 9 of

57    Title 34.  For purposes of this article, each activity undertaken by the administrator on

58    behalf of an insurer or the client of the administrator is considered a transaction and is

59    subject to the provisions of this title.

60   (2)  'Business entity' means a corporation, association, partnership, sole proprietorship,
61   limited liability company, limited liability partnership, or other legal entity.
62   (3)  'Standard financial quarter' means a three-month period ending on March 31, June
63   30, September 30, or December 31 of any calendar year.
64   (b)  Notwithstanding the provisions of subsection (a) of this Code section, the following
65   are exempt from licensure ~~as~~ so long as such entities are acting directly through their
66   officers and employees:
67   (1)  An employer on behalf of its employees or the employees of one or more subsidiary
68   or affiliated corporations of such employer;
69   (2)  A union on behalf of its members;
70   (3)   An insurance company licensed in this state or its affiliate unless the affiliate
71   administrator is placing business with a nonaffiliate insurer not licensed in this state;
72   (4)  An insurer which is not authorized to transact insurance in this state if such insurer
73   is administering a policy lawfully issued by it in and pursuant to the laws of a state in
74   which it is authorized to transact insurance;
75   (5)  A life or accident and sickness insurance agent or broker licensed in this state whose
76   activities are limited exclusively to the sale of insurance;
77   (6)  A creditor on behalf of its debtors with respect to insurance covering a debt between
78   the creditor and its debtors;
79   (7)  A trust established in conformity with 29 U.S.C. Section 186 and its trustees, agents,
80   and employees acting thereunder;
81   (8)  A trust exempt from taxation under Section 501(a) of the Internal Revenue Code and
82   its trustees and employees acting thereunder or a custodian and its agents and employees
83   acting pursuant to a custodian account which meets the requirements of Section 401(f)
84   of the Internal Revenue Code;
85   (9)  A bank, credit union, or other financial institution which is subject to supervision or
86   examination by federal or state banking authorities;
87   (10) A credit card issuing company which advances for and collects premiums or charges
88   from its credit card holders who have authorized it to do so, provided that such company
89   does not adjust or settle claims;
90   (11) A person who adjusts or settles claims in the normal course of his or her practice or
91   employment as an attorney and who does not collect charges or premiums in connection
92   with life or accident and sickness insurance coverage or annuities;
93   (12)  ~~A business entity that acts solely as an administrator of one or more bona fide~~
94   ~~employee benefit plans established by an employer or an employee organization, or both,~~
95   ~~for whom the insurance laws of this state are preempted pursuant to the federal Employee~~
96   ~~Retirement Income Security Act of 1974, 29 U.S.C. Section 1001, et seq.~~ An insurance

97   company licensed in this state or its affiliate if such insurance company or its affiliate is
98   solely administering limited benefit insurance.  For the purpose of this paragraph, the
99   term 'limited benefit insurance' means accident or sickness insurance designed,
100  advertised, and marketed to supplement major medical insurance and specifically shall
101  include accident only, CHAMPUS supplement, disability income, fixed indemnity,
102  long-term care, or specified disease insurance; or
103  (13)  An association that administers workers' compensation claims solely on behalf of
104  its members.
105  (c)  A business entity claiming an exemption shall submit an exemption notice on a form
106  provided by the Commissioner.  This form must be signed by an officer of the company
107  and submitted to the department by December 31 of the year prior to the year for which an
108  exemption is to be claimed.  Such exemption notice shall be updated in writing within 30
109  days if the basis for such exemption changes.  An administrator claiming an exemption
110  pursuant to paragraphs (3) and (4) of subsection (b) of this Code section shall be subject
111  to the provisions of Code Sections 33-24-59.5 and 33-24-59.14.
112  (d)  Obtaining a license as an administrator does not exempt the applicant from other
113  licensing requirements under this title.
114  (e) Obtaining a license as an administrator subjects the applicant to the provisions of Code
115  Sections 33-24-59.5 and 33-24-59.14.
116  (f) An administrator shall be subject to Code Sections 33-24-59.5 and 33-24-59.14 unless
117  the administrator provides sufficient evidence that the self-insured health plan failed to
118  properly fund the plan to allow the administrator to pay any outside claim."

119                              **SECTION 5.**
120  Said title is further amended by revising Code Section 33-24-59.5, relating to timely payment
121  of health benefits, as follows:
122  "33-24-59.5.
123  (a)  As used in this Code section, the term:
124  (1)  'Benefits' means the coverages provided by a health benefit plan for financing or
125  delivery of health care goods or services; but such term does not include capitated
126  payment arrangements under managed care plans.
127  (2)  'Health benefit plan' means any hospital or medical insurance policy or certificate,
128  health care plan contract or certificate, qualified higher deductible health plan, health
129  maintenance organization subscriber contract, any health benefit plan established
130  pursuant to Article 1 of Chapter 18 of Title 45, or any dental or vision care plan or policy,
131  or managed care plan or self-insured plan; but health benefit plan does not include

132    policies issued in accordance with Chapter 31 of this title; disability income policies; or

133    Chapter 9 of Title 34, relating to workers' compensation.

134    (3) 'Insurer' means an accident and sickness insurer, fraternal benefit society, nonprofit

135    hospital service corporation, nonprofit medical service corporation, health care

136    corporation, health maintenance organization, provider sponsored health care corporation,

137    or any similar entity and any self-insured health benefit plan ~~not subject to the exclusive~~

138    ~~jurisdiction of the federal Employee Retirement Income Security Act of 1974, 29 U.S.C.~~

139    ~~Section 1001, et seq.~~, which entity provides for the financing or delivery of health care

140    services through a health benefit plan, <u>the plan administrator of any health plan,</u> or the

141    plan administrator of any health benefit plan established pursuant to Article 1 of Chapter

142    18 of Title 45 <u>or any other administrator as defined in paragraph (1) of subsection (a) of</u>

143    <u>Code Section 33-23-100</u>.

144    (b)(1) All benefits under a health benefit plan will be payable by the insurer which is

145    obligated to finance or deliver health care services under that plan upon such insurer's

146    receipt of written <u>or electronic</u> proof of loss or claim for payment for health care goods

147    or services provided.  The insurer shall within 15 working days <u>for electronic claims or</u>

148    <u>30 calendar days for paper claims</u> after such receipt mail <u>or send electronically</u> to the

149    insured or other person claiming payments under the plan payment for such benefits or

150    a letter or electronic notice which states the reasons the insurer may have for failing to

151    pay the claim, either in whole or in part, and which also gives the person so notified a

152    written itemization of any documents or other information needed to process the claim

153    or any portions thereof which are not being paid.  Where the insurer disputes a portion

154    of the claim, any undisputed portion of the claim shall be paid by the insurer in

155    accordance with this chapter.  When all of the listed documents or other information

156    needed to process the claim has been received by the insurer, the insurer shall then have

157    15 working days <u>for electronic claims or 30 calendar days for paper claims</u> within which

158    to process and either mail payment for the claim or a letter or notice denying it, in whole

159    or in part, giving the insured or other person claiming payments under the plan the

160    insurer's reasons for such denial.

161    (2)  Receipt of any proof, claim, or documentation by an entity which administrates or

162    processes claims on behalf of an insurer shall be deemed receipt of the same by the

163    insurer for purposes of this Code section.

164    (c)  Each insurer shall pay to the insured or other person claiming payments under the

165    health benefit plan interest equal to ~~18~~ <u>12</u> percent per annum on the proceeds or benefits

166    due under the terms of such plan for failure to comply with subsection (b) of this Code

167    section.

168    (d)  An insurer may only be subject to an administrative penalty by the Commissioner as
169    authorized by the insurance laws of this state when such insurer processes less than 95
170    percent of all claims in a standard financial quarter in compliance with paragraph (1) of
171    subsection (b) of this Code section.  Such penalty shall be assessed on data collected by the
172    Commissioner.
173    (e)  This Code section shall be applicable when an insurer is adjudicating claims for its
174    fully insured business or its business as a third-party administrator."

175                                          **SECTION 6.**
176    Said title is further amended in Article 1 of Chapter 24, relating to general provisions
177    concerning insurance, by adding a new Code section to read as follows:
178    "33-24-59.14.
179    (a)  As used in this Code section, the term:
180    (1) 'Administrator' shall have the same meaning as provided in Code Section 33-23-100.
181    (2)  'Benefits' shall have the same meaning as provided in Code Section 33-24-59.5.
182    (3)  'Facility' shall have the same meaning as provided in Code Section 33-20A-3.
183    (4)   'Health benefit plan' shall have the same meaning as provided in Code
184    Section 33-24-59.5.
185    (5)   'Health care provider' shall have the same meaning as provided in Code
186    Section 33-20A-3.
187    (6) 'Insurer' means an accident and sickness insurer, fraternal benefit society, nonprofit
188    hospital service corporation, nonprofit medical service corporation, health care
189    corporation, health maintenance organization, provider sponsored health care corporation,
190    or any similar entity, which entity provides for the financing or delivery of health care
191    services through a health benefit plan, the plan administrator of any health plan, or the
192    plan administrator of any health benefit plan established pursuant to Article 1 of Chapter
193    18 of Title 45.
194    (b)(1)   All benefits under a health benefit plan will be payable by the insurer or
195    administrator which is obligated to finance or deliver health care services or process
196    claims under that plan upon such insurer's or administrator's receipt of written or
197    electronic proof of loss or claim for payment for health care goods or services provided.
198    The insurer or administrator shall within 15 working days for electronic claims or 30
199    calendar days for paper claims after such receipt mail or send electronically to the facility
200    or health care provider claiming payments under the plan payment for such benefits or
201    a letter or notice which states the reasons the insurer or administrator may have for failing
202    to pay the claim, either in whole or in part, and which also gives the facility or health care
203    provider so notified a written itemization of any documents or other information needed

204   to process the claim or any portions thereof which are not being paid.  Where the insurer
205   or administrator disputes a portion of the claim, any undisputed portion of the claim shall
206   be paid by the insurer or administrator in accordance with this chapter.  When all of the
207   listed documents or other information needed to process the claim have been received by
208   the insurer or administrator, the insurer or administrator shall then have 15 working days
209   for electronic claims or 30 calendar days for paper claims within which to process and
210   either mail payment for the claim or a letter or notice denying it, in whole or in part,
211   giving the facility or health care provider claiming payments under the plan the insurer's
212   or administrator's reasons for such denial.
213   (2)  Receipt of any proof, claim, or documentation by an entity which administers or
214   processes claims on behalf of an insurer shall be deemed receipt of the same by the
215   insurer for purposes of this Code section.
216   (c)  Each insurer or administrator shall pay to the facility or health care provider claiming
217   payments under the health benefit plan interest equal to 12 percent per annum on the
218   proceeds or benefits due under the terms of such plan for failure to comply with subsection
219   (b) of this Code section.
220   (d)  An insurer or administrator may only be subject to an administrative penalty by the
221   Commissioner as authorized by the insurance laws of this state when such insurer or
222   administrator processes less than 95 percent of all claims in a standard financial quarter in
223   compliance with paragraph (1) of subsection (b) of this Code section.  Such penalty shall
224   be assessed on data collected by the Commissioner.
225   (e)  This Code section shall be applicable when an insurer is adjudicating claims for its
226   fully insured business or its business as a third-party administrator.
227   (f)  This Code section shall not apply to limited benefit insurance policies.  For the purpose
228   of this subsection, the term 'limited benefit insurance' means accident or sickness insurance
229   designed, advertised, and marketed to supplement major medical insurance and specifically
230   shall include accident only, CHAMPUS supplement, disability income, fixed indemnity,
231   long-term care, or specified disease insurance."

232                            **SECTION 7.**
233   (a)  Except as otherwise provided by subsection (b) of this section, this Act shall become
234   effective on July 1, 2011.
235   (b)  Sections 4, 5, and 6 of this Act shall become effective January 1, 2013.

236                            **SECTION 8.**
237   All laws and parts of laws in conflict with this Act are repealed.

# EXHIBIT D

House Bill 321 (AS PASSED HOUSE AND SENATE)

By: Representatives Davis of the 109th, Rogers of the 26th, and Holt of the 112th

A BILL TO BE ENTITLED

AN ACT

1   To amend Title 33 of the Official Code of Georgia Annotated, relating to insurance, so as to

2   provide for changes in the definitions of the terms "group accident and sickness insurance"

3   and "true association"; to provide a short title; to provide certain definitions; to include plan

4   administrators in prompt pay requirements; to provide for penalties; to provide an effective

5   date; to provide for related matters; to repeal conflicting laws; and for other purposes.

6              BE IT ENACTED BY THE GENERAL ASSEMBLY OF GEORGIA:

7                              **SECTION 1.**

8   This Act shall be known and may be cited as the "Insurance Delivery Enhancement Act of

9   2009."

10                             **SECTION 2.**

11  Title 33 of the Official Code of Georgia Annotated, relating to insurance, is amended by

12  revising paragraphs (2) and (3) of subsection (a) of Code Section 33-30-1 as follows:

13      ″(2)  Under a policy issued to an association, including a labor union, which shall have

14         a constitution and bylaws and which has been organized and is maintained in good faith

15         for purposes other than that of obtaining insurance, insuring at least ~~25~~ 10 members,

16         employees, or employees of members of the association for the benefit of persons other

17         than  the  association  or  its  officers  or  trustees.   As  used  in  this  paragraph,  the  term

18         'employees' may include retired employees;

19      (3)  Under a policy issued to the trustees of a fund established by two or more employers

20         in the same industry, by one or more labor unions, by one or more employers and one or

21         more labor unions, or by an association, as defined in paragraph (2) of this Code section,

22         which trustees shall be deemed the policyholder, to insure not less than ~~25~~ 10 employees

23         of the employers or members of the union or of such association or of members of such

24         association for the benefit of persons other than the employers or other unions or such

25    associations.  As used in this paragraph, the term 'employees' includes the officers,
26    managers, and employees of the employer and the individual proprietor or partners, if the
27    employer is an individual proprietor or partnership.  The term may include retired
28    employees.  The policy may provide that the term 'employees' shall include the trustees
29    or their employees, or both, if their duties are principally connected with such
30    trusteeship;″

31                                            **SECTION 3.**
32    Said title is further amended by revising subparagraph (a)(7)(A) of Code Section 33-30-1 as
33    follows:
34    ″(7)(A)  Under a policy issued to a legal entity providing a multiple employer welfare
35    arrangement, which means any employee benefit plan which is established or
36    maintained for the purpose of offering or providing accident and sickness benefits to
37    the employees of two or more employers, including self-employed individuals,
38    individuals whose compensation is reported on federal Internal Revenue Service Form
39    1099, and their spouses or dependents.  The term ~~does~~ shall not apply to any plan or
40    arrangement which is established or maintained by a tax-exempt rural electric
41    cooperative or a collective bargaining agreement.″

42                                            **SECTION 4.**
43    Said title is further amended by revising Code Section 33-23-100, relating to the definition
44    of administrator, as follows:
45    ″33-23-100.
46    (a)  As used in this article, the term:
47    (1) 'Administrator' means any business entity that, directly or indirectly, collects charges,
48    fees, or premiums; adjusts or settles claims, including investigating or examining claims
49    or receiving, disbursing, handling, or otherwise being responsible for claim funds; ~~and~~
50    or provides underwriting or precertification and preauthorization of hospitalizations or
51    medical treatments for residents of this state for or on behalf of any insurer, including
52    business entities that act on behalf of ~~multiple~~ a single or multiple employer
53    self-insurance health ~~plans, and~~ plan or a self-insured ~~municipalities~~ municipality or other
54    political ~~subdivisions~~ subdivision.  Licensure is also required for administrators who act
55    on behalf of self-insured plans providing workers' compensation benefits pursuant to
56    Chapter 9 of Title 34.  For purposes of this article, each activity undertaken by the
57    administrator on behalf of an insurer or the client of the administrator is considered a
58    transaction and is subject to the provisions of this title.

59      (2)  'Business entity' means a corporation, association, partnership, sole proprietorship,

60      limited liability company, limited liability partnership, or other legal entity.

61      (3)  'Standard financial quarter' means a three-month period ending on March 31, June

62      30, September 30, or December 31 of any calendar year.

63   (b)  Notwithstanding the provisions of subsection (a) of this Code section, the following

64   are exempt from licensure as so long as such entities are acting directly through their

65   officers and employees:

66      (1)  An employer on behalf of its employees or the employees of one or more subsidiary

67      or affiliated corporations of such employer;

68      (2)  A union on behalf of its members;

69      (3)  An insurance company licensed in this state or its affiliate unless the affiliate

70      administrator is placing business with a nonaffiliate insurer not licensed in this state;

71      (4)  An insurer which is not authorized to transact insurance in this state if such insurer

72      is administering a policy lawfully issued by it in and pursuant to the laws of a state in

73      which it is authorized to transact insurance;

74      (5)  A life or accident and sickness insurance agent or broker licensed in this state whose

75      activities are limited exclusively to the sale of insurance;

76      (6)  A creditor on behalf of its debtors with respect to insurance covering a debt between

77      the creditor and its debtors;

78      (7)  A trust established in conformity with 29 U.S.C. Section 186 and its trustees, agents,

79      and employees acting thereunder;

80      (8)  A trust exempt from taxation under Section 501(a) of the Internal Revenue Code and

81      its trustees and employees acting thereunder or a custodian and its agents and employees

82      acting pursuant to a custodian account which meets the requirements of Section 401(f)

83      of the Internal Revenue Code;

84      (9)  A bank, credit union, or other financial institution which is subject to supervision or

85      examination by federal or state banking authorities;

86      (10)  A credit card issuing company which advances for and collects premiums or charges

87      from its credit card holders who have authorized it to do so, provided that such company

88      does not adjust or settle claims;

89      (11)  A person who adjusts or settles claims in the normal course of his or her practice or

90      employment as an attorney and who does not collect charges or premiums in connection

91      with life or accident and sickness insurance coverage or annuities;

92      (12)  A business entity that acts solely as an administrator of one or more bona fide

93      employee benefit plans established by an employer or an employee organization, or both,

94      for whom the insurance laws of this state are preempted pursuant to the federal Employee

95      Retirement Income Security Act of 1974, 29 U.S.C. Section 1001, et seq. An insurance

96    company licensed in this state or its affiliate if such insurance company or its affiliate is

97    solely administering limited benefit insurance.  For the purpose of this paragraph, the

98    term 'limited benefit insurance' means accident or sickness insurance designed,

99    advertised, and marketed to supplement major medical insurance, specifically: accident

100   only, CHAMPUS supplement, disability income, fixed indemnity, long-term care, or

101   specified disease; or

102   (13)  An association that administers workers' compensation claims solely on behalf of

103   its members.

104   (c)  A business entity claiming an exemption shall submit an exemption notice on a form

105   provided by the Commissioner.  This form must be signed by an officer of the company

106   and submitted to the department by December 31 of the year prior to the year for which an

107   exemption is to be claimed.  Such exemption notice shall be updated in writing within 30

108   days if the basis for such exemption changes.  An administrator claiming an exemption

109   pursuant to paragraphs (3) and (4) of subsection (b) of this Code section shall be subject

110   to the provisions of Code Sections 33-24-59.5 and 33-24-59.13.

111   (d)  Obtaining a license as an administrator does not exempt the applicant from other

112   licensing requirements under this title.

113   (e)  Obtaining a license as an administrator subjects the applicant to the provisions of Code

114   Sections 33-24-59.5 and 33-24-59.13.

115   (f)  An administrator shall be subject to Code Sections 33-24-59.5 and 33-24-59.13 unless

116   the administrator provides sufficient evidence that the self-insured health plan failed to

117   properly fund the plan to allow the administrator to pay any outside claim."

118                                              **SECTION 5.**

119   Said title is further amended by revising Code Section 33-24-59.5, relating to timely payment

120   of health benefits, as follows:

121   "33-24-59.5.

122   (a)  As used in this Code section, the term:

123   (1)  'Benefits' means the coverages provided by a health benefit plan for financing or

124   delivery of health care goods or services; but such term does not include capitated

125   payment arrangements under managed care plans.

126   (2)  'Health benefit plan' means any hospital or medical insurance policy or certificate,

127   health care plan contract or certificate, qualified higher deductible health plan, health

128   maintenance organization subscriber contract, any health benefit plan established

129   pursuant to Article 1 of Chapter 18 of Title 45, or any dental or vision care plan or policy,

130   or managed care plan or self-insured plan; but health benefit plan does not include

131  policies issued in accordance with Chapter 31 of this title; disability income policies; or

132  Chapter 9 of Title 34, relating to workers' compensation.

133  (3) 'Insurer' means an accident and sickness insurer, fraternal benefit society, nonprofit

134  hospital service corporation, nonprofit medical service corporation, health care

135  corporation, health maintenance organization, provider sponsored health care corporation,

136  or any similar entity and any self-insured health benefit plan ~~not subject to the exclusive~~

137  ~~jurisdiction of the federal Employee Retirement Income Security Act of 1974, 29 U.S.C.~~

138  ~~Section 1001, et seq.,~~ which entity provides for the financing or delivery of health care

139  services through a health benefit plan, <u>the plan administrator of any health plan,</u> or the

140  plan administrator of any health benefit plan established pursuant to Article 1 of Chapter

141  18 of Title 45 <u>or any other administrator as defined in paragraph (1) of subsection (a) of</u>

142  <u>Code Section 33-23-100</u>.

143  (b)(1) All benefits under a health benefit plan will be payable by the insurer which is

144  obligated to finance or deliver health care services under that plan upon such insurer's

145  receipt of written <u>or electronic</u> proof of loss or claim for payment for health care goods

146  or services provided.  The insurer shall within 15 working days <u>for electronic claims or</u>

147  <u>30 calendar days for paper claims</u> after such receipt mail <u>or send electronically</u> to the

148  insured or other person claiming payments under the plan payment for such benefits or

149  a letter or electronic notice which states the reasons the insurer may have for failing to

150  pay the claim, either in whole or in part, and which also gives the person so notified a

151  written itemization of any documents or other information needed to process the claim

152  or any portions thereof which are not being paid.  Where the insurer disputes a portion

153  of the claim, any undisputed portion of the claim shall be paid by the insurer in

154  accordance with this chapter.  When all of the listed documents or other information

155  needed to process the claim has been received by the insurer, the insurer shall then have

156  15 working days <u>for electronic claims or 30 calendar days for paper claims</u> within which

157  to process and either mail payment for the claim or a letter or notice denying it, in whole

158  or in part, giving the insured or other person claiming payments under the plan the

159  insurer's reasons for such denial.

160  (2)  Receipt of any proof, claim, or documentation by an entity which administrates or

161  processes claims on behalf of an insurer shall be deemed receipt of the same by the

162  insurer for purposes of this Code section.

163  (c)  Each insurer shall pay to the insured or other person claiming payments under the

164  health benefit plan interest equal to ~~18~~ <u>12</u> percent per annum on the proceeds or benefits

165  due under the terms of such plan for failure to comply with subsection (b) of this Code

166  section.

167    (d)  An insurer may only be subject to an administrative penalty by the Commissioner as
168    authorized by the insurance laws of this state when such insurer processes less than 95
169    percent of all claims in a standard financial quarter in compliance with paragraph (1) of
170    subsection (b) of this Code section.  Such penalty shall be assessed on data collected by the
171    Commissioner.
172    (e)  This Code section shall be applicable when an insurer is adjudicating claims for its
173    fully insured business or its business as a third-party administrator."

174                                               **SECTION 6.**
175    Said title is further amended in Article 1 of Chapter 24, relating to general provisions
176    concerning insurance, by adding a new Code section to read as follows:
177    "33-24-59.13.
178    (a)  As used in this Code section, the term:
179    (1) 'Administrator' shall have the same meaning as provided in Code Section 33-23-100.
180    (2) 'Benefits' shall have the same meaning as provided in Code Section 33-24-59.5.
181    (3) 'Facility' shall have the same meaning as provided in Code Section 33-20A-3.
182    (4)  'Health benefit plan' shall have the same meaning as provided in Code
183    Section 33-24-59.5.
184    (5)  'Health care provider' shall have the same meaning as provided in Code
185    Section 33-20A-3.
186    (6) 'Insurer' means an accident and sickness insurer, fraternal benefit society, nonprofit
187    hospital service corporation, nonprofit medical service corporation, health care
188    corporation, health maintenance organization, provider sponsored health care corporation,
189    or any similar entity, which entity provides for the financing or delivery of health care
190    services through a health benefit plan, the plan administrator of any health plan, or the
191    plan administrator of any health benefit plan established pursuant to Article 1 of Chapter
192    18 of Title 45.
193    (b)(1)  All benefits under a health benefit plan will be payable by the insurer or
194    administrator which is obligated to finance or deliver health care services or process
195    claims under that plan upon such insurer's or administrator's receipt of written or
196    electronic proof of loss or claim for payment for health care goods or services provided.
197    The insurer or administrator shall within 15 working days for electronic claims or 30
198    calendar days for paper claims after such receipt mail or send electronically to the facility
199    or health care provider claiming payments under the plan payment for such benefits or
200    a letter or notice which states the reasons the insurer or administrator may have for failing
201    to pay the claim, either in whole or in part, and which also gives the facility or health care
202    provider so notified a written itemization of any documents or other information needed

203    to process the claim or any portions thereof which are not being paid.  Where the insurer

204    or administrator disputes a portion of the claim, any undisputed portion of the claim shall

205    be paid by the insurer or administrator in accordance with this chapter.  When all of the

206    listed documents or other information needed to process the claim have been received by

207    the insurer or administrator, the insurer or administrator shall then have 15 working days

208    for electronic claims or 30 calendar days for paper claims within which to process and

209    either mail payment for the claim or a letter or notice denying it, in whole or in part,

210    giving the facility or health care provider claiming payments under the plan the insurer's

211    or administrator's reasons for such denial.

212    (2)  Receipt of any proof, claim, or documentation by an entity which administers or

213    processes claims on behalf of an insurer shall be deemed receipt of the same by the

214    insurer for purposes of this Code section.

215    (c)  Each insurer or administrator shall pay to the facility or health care provider claiming

216    payments under the health benefit plan interest equal to 12 percent per annum on the

217    proceeds or benefits due under the terms of such plan for failure to comply with subsection

218    (b) of this Code section.

219    (d)  An insurer or administrator may only be subject to an administrative penalty by the

220    Commissioner as authorized by the insurance laws of this state when such insurer or

221    administrator processes less than 95 percent of all claims in a standard financial quarter in

222    compliance with paragraph (1) of subsection (b) of this Code section.  Such penalty shall

223    be assessed on data collected by the Commissioner.

224    (e)  This Code section shall be applicable when an insurer is adjudicating claims for its

225    fully insured business or its business as a third-party administrator."

226    **SECTION 7.**

227    (a)  Except as otherwise provided by subsection (b) of this section, this Act shall become

228    effective on July 1, 2009.

229    (b)  Sections 4, 5, and 6 of this Act shall become effective January 1, 2011.

230    **SECTION 8.**

231    All laws and parts of laws in conflict with this Act are repealed.

# EXHIBIT E

  

**GEORGIA**GOV

> This is historical material and should be used for research purposes only.
> The web site is no longer updated, and some links may not work.



# Governor Perdue Signs Bill Clarifying Georgia's Gun Laws

Tuesday, June 8, 2010        Contact: Office of Communications 404-651-7774

ATLANTA – Governor Sonny Perdue announced today that he has signed Senate Bill 308, a bill that clarifies Georgia law on where it is legal for licensed permit holders to carry guns. SB 308 was sponsored by Sen. Mitch Seabaugh.

"Georgia's Common Sense Lawful Carry Act protects lawfully carrying citizens from unknowingly becoming criminals by clarifying where they can and cannot carry their weapons," Sen. Seabaugh said. "They know all too well that a license to carry is not a license to commit a crime. This law was truly written by the citizens of Georgia, with input from all interested constituents. Government should work for the people to protect their freedoms and constitutionally guaranteed rights. I want to thank Gov. Perdue and my colleagues in the Legislature for their support and willingness to work on this legislation. I also want to thank everyone who provided valuable input into writing this bill to help achieve a law that makes sense."

"GeorgiaCarry.Org appreciates Governor Perdue's signing this important legislation," stated Ed Stone, President of GCO. "It is vital for law-abiding citizens who wish to arm themselves for self-defense to know definitively what places are off-limits. This bill, through the leadership of Sen. Seabaugh, eliminates much of the ambiguity inherent in the former law. GeorgiaCarry.org believes that this legislation is an important step in the restoration and full implementation of law-abiding citizens' right to bear arms."

In addition to SB 308, the Governor also announced the signings and vetoes of the remaining bills that were passed by the legislature this session. The following bills were signed on Friday, June 4: HB 705, HB 936, HB 948, HB 991, HB 994, HB 997, HB 1002, HB 1040, HB 1069, HB 1072, HB 1123, HB 1186, HB 1197, HB 1213, HB 1214, HB 1261, HB 1285, HB 1286, HB 1288, HB 1355, HB 1364, HB 1429, HB 1430, HB 1447, HB 1448, HB 1467, HB 1470, HB 1490, HB 1500, HR 1588, SB 17, SB 277, SB 371, SB 389, SB 390, SB 419, SB 436 and SR 1083.

The following bills were vetoed: HB 321, HB 417, HB 827, HB 907, HB 990, HB 1023, HB 1028, HB 1082, HB 1236, HB 1251, HB 1272, HB 1321, HB 1407, HB 1422, HB 1465, HB 1478, SB 1, SB 148, SB 239, SB 291, SB 373, SB 374, SB 414, SB 415, SB 480, SB 539 and SB 547

Veto messages for each bill vetoed are below.

**General Legislation**

**Indemnification bills**

**HB 827** and **SB 414** expand eligibility for state and local employees to be covered under the state indemnification program, and also broaden the categories of family members allowed to

recover under the program. The indemnification program is not insurance, it is an additional and special benefit for state and local employees in particularly dangerous jobs that provides additional funds to the workers' dependents when those employees are injured or killed. Most, if not all, of those workers are already provided life insurance and workers compensation. The original intent of the program was to provide some additional funds to the people truly dependent on the employees' income when an injury or death interrupted the steady income stream. These bills substantially broaden the definition of "dependent", which departs from the original intent of the program. More importantly, the bills undermine the long-term sustainability of the indemnification program by expanding the program without identifying additional funds. Accordingly, **I VETO HB 827** and **SB 414**.

**Miscellaneous**

**HB 321**, the "prompt pay" bill, is a bill I would have liked the opportunity to sign. Unfortunately, the Medical Association of Georgia insisted (over the objections of many) on including language that likely violates the Employee Retirement Income Security Act ("ERISA"), a federal law that preempts portions of HB 321 as written. Because the Supremacy Clause of the United States Constitution precludes state law from violating federal law, I will not sign a bill that contravenes ERISA.  Accordingly, **I VETO HB 321**.

**HB 417** attempted to clarify which version of documents related to insurance contracts control when multiple versions in different languages conflict. As written, I believe the consequences of such a change in policy could be quite detrimental, and so **I VETO HB 417**.

**HB 907** was originally intended to allow additional flexibility for management of middle schools, which I support. During the legislative process, however, language from another bill was added which imposes onerous requirements on the Department of Education regarding the Special Needs Voucher, most significant of which was the unqualified requirement to pay such vouchers in four equal quarterly payments. In a budget environment as challenging as this one – an environment in which public schools are being forced to operate on smaller budgets – it is not appropriate to tie administrators' hands and require them to fund vouchers fully as they seek budget flexibility elsewhere during these uncertain economic times. For these reasons, **I VETO HB 907**.

**HB 990**, sponsored by Rep. Alan Powell, began as the Georgia State Patrol's Federal Motor Carrier Compliance legislation, which resolved issues of incompatibility and enforcement between state law and federal regulations. Unfortunately, the bill was amended during the legislative process with a Fleet Vehicle Registration Plan Amendment. This amendment causes significant operational hurdles and will cost the Department of Revenue nearly $1 million to implement, funds which were not appropriated for this purpose. Accordingly, **I VETO HB 990**.

**HB 1023** contains various changes to tax policy, many of which may have merit but also have substantial impact on future state revenues. HB 1405, which I have signed, creates a Tax Reform Study Committee charged with the task of reviewing all our tax policies and proposing sweeping changes as needed to the General Assembly for its consideration next session. Because of the long-term fiscal implications of HB 1023, I believe the tax policy changes it contains are best considered by the Tax Reform Study Committee, rather than signing them all into law at this time. For this reason, **I VETO HB 1023**.

**HB 1028** allows landowners that have placed their land in a conservation covenant to subdivide that land in a manner allowing them to avoid paying tax penalties. In 2008, I signed the Forest Land Protection Act, which provides a way for forest land owners to continue their ownership of these valuable resources by reducing the burden of property taxes on their forest land. The State and local governments have invested millions of dollars in this program, the purpose of which was to help owners maintain their land for conservation purposes. Property owners who make an agreement with the State to conserve their forest for the term of the conservation covenant – and accepts a financial benefit in return – is and should be responsible for any breach of that

agreement. HB 1028 would allow owners who sell land they have agreed to keep as forest land to avoid penalties if the conservation covenant is broken. This does not promote the original intent of the Forest Land Protection Act to help owners conserve their forests, and so **I VETO HB 1028**.

**HB 1082** creates a new kind of freeport exemption available to local governments. Currently, local governments are able to enact a freeport exemption that exempts warehouses, distributors, manufacturers, and the like from inventory taxes. HB 1082 creates a second kind of exemption that would apply to retailers. Because this expansion of the exemption would merely create competition between counties at the expense of the property tax base of each county, **I VETO HB 1082**.

**HB 1236** requires all municipal court judges to be members of the State Bar of Georgia. Because I believe cities should be able to decide what qualifications their municipal judges should have, **I VETO HB 1236**.

**HB 1251** allows for significant exemptions from sales taxes for future tourism projects. In previous years, I have supported state participation in tourism projects when considered on a case-by-case basis. I have signed legislation in the past to assist tourism developments and this year I supported bond funding for the College Football Hall of Fame. However, I cannot support legislation that funds up to 25 percent of the cost of a tourism project by allowing the developers to receive refunds on state sales taxes that are collected. The tourism industry is one of Georgia's most important economic drivers, but funding developments through sales tax refunds has never been done in Georgia which sets precedent that I cannot support. As I have said repeatedly, the process used in previous years to consider projects with legislation on a case-by-case basis removes any unintended consequences of a bill such as this, and so **I VETO HB 1251**.

**HB 1272** adds to state tax forms the opportunity for individual taxpayers to direct the Department of Revenue to send their state tax refund to research regarding lupus, kidney disease, and multiple sclerosis. Organizations seeking to cure such diseases and relieve the pain and suffering of those who have them are to be commended. This bill, however, is not an appropriate way in which to help such organizations. The cost to the State of administering such options decreases the amount of the contribution to the organizations, which benefit more if people instead donate directly to those organizations. Not only so, but the legislation does not identify which organizations should receive the funds – it leaves it to the discretion of the Department of Revenue to select. Moreover, state tax forms already include eight such options for other deserving causes. Adding more will confuse taxpayers. Since only laudable causes will receive the votes of the General Assembly, there will never be a stopping place everyone will agree upon. Therefore, I cannot sign a bill adding to an already over-crowded set of options, and accordingly **I VETO HB 1272**.

**HB 1321** expands the permissible purposes for which 911 taxes currently imposed on phone bills may be used. The bill violates the original intent of those funds, which was to provide counties with a mechanism to support emergency 911 services – not for counties to use for other needs such as operable and interoperable radio equipment. Accordingly, **I VETO HB 1321**.

**HB 1407** would require the Department of Community Health to contract with a single administrator to provide dental services to recipients of medical assistance and participants in the PeachCare for Kids program. In 2008, I signed HB 1234, which provided a balanced approach to addressing some health care providers' concerns with Georgia's managed Medicaid program, and which maintained the healthy tension between providers and the Care Management Organizations that have been so successful in reducing the growth of Georgia's Medicaid budget. I said then that I would not support further legislative encroachment upon this very successful program, which has trimmed the annual growth rate of Medicaid spending from 12 to 14 percent a year to four to five percent a year. This is saving the state over $1 billion annually at a time where any budget savings are critical. For these reasons, and the unknown fiscal consequences associated with this legislation, **I VETO HB 1407**.

**SB 239** ensures that families moving from one school district to another register their children for school in a timely manner. Unfortunately, the language of a floor amendment seeking to safeguard homeschooling families instead accomplished the opposite; as written, the bill would actually require homeschooling families to enroll their children in a public or private school upon moving to a new school district. Because of this unintended consequence, **I VETO SB 239**.

**SB 291** changes a variety of provisions within Georgia law regarding firearms. Among others, this bill would allow firearms to be carried into unsecure areas of airports. I have already signed SB 308, which clarifies Georgia's public gathering statute and preserves the rights of private property owners. I believe this language is sufficient and adequately clarifies the law for Georgia firearms license holders. For this reason, and despite unwarranted intrusion into this state matter by ill-advised federal officials**, I VETO SB 291**.

**SB 373** mandates that private employers turn over employment history records to law enforcement agencies when law enforcement agencies are conducting background investigations on applications and officers eligible for certification and recertification. The state should not be mandating a private business to turn over records to a law enforcement agency or any public agency absent the due process provided through existing judicial and quasi-judicial processes. Moreover, the language limiting liability for private companies complying with the law is insufficient; it immunizes privates businesses for liability only when they provide "complete and accurate" information. Because the question of whether the information provided was complete and accurate will likely be a primary ground of litigation, this is an exception that will swallow the rule. For these reasons, **I VETO SB 373**.

**SB 415** essentially provides liability protection for one company that does business in the area of emergency communications. Although I strongly support tort reform, I believe it is inappropriate to do it one company at a time, and so **I VETO SB 415**.

**Separation of powers**

The Constitution gives the General Assembly sweeping legislative powers, including the authority to create and eliminate state agencies, alter their powers, and determine their budgets. The Constitution gives the Executive Branch executive powers -- the responsibility to administer agencies, exercise such powers as are given by the General Assembly, and spend the amounts budgeted by the General Assembly. The Constitution requires the legislative and executive powers to remain separate: "The legislative, judicial, and executive powers shall forever remain separate and distinct, and no person discharging the duties of one shall at the same time exercise the functions of either of the others...." Ga. Const. Art . 1, Sec. 2, Para. 3. Often, during the last year of a Governor's last term, it is assumed that the outgoing Governor will be less vigilant in ensuring that these powers remain separate. I believe it is necessary, however, carefully to maintain that separation regardless of who is Governor. Four bills passed this year – SB 1, SB 148, SB 374, and SB 480 – are, in my view, inconsistent with the separation of powers required by the Georgia Constitution.

**SB 1** provides changes to Georgia's budget act requiring a purported zero-based budgeting methodology to be applied to a fraction of all state programs annually and for all programs once every four years. Georgia first attempted this budget methodology in the 1970s under Governor Jimmy Carter and has abandoned it since that time. A survey of states finds that of the   states that currently maintain this methodology in their statutes all have effectively abandoned the practice because of the additional bureaucratic process and overhead while producing few identifiable results. Additionally, SB 1 does not change the budget process employed by the General Assembly (which could employ zero-based budgeting in its budget process under current law if it so chose). Instead, SB 1 requires state agencies to administer dual budget processes concurrently, the new and the current budget process, to be implemented immediately for the upcoming budget cycle. It is not technically feasible to reprogram state information technology systems or to provide resources for this endeavor on the timeline stated in the bill. While SB 1 is motivated by an admirable goal, the realities of Georgia's and other states' experiences have demonstrated few results worth the overhead associated with this new process. Moreover,

anyone familiar with the budget process I have employed during my eight years as Governor knows that I and my staff examine all facets of each agency's budget each year. Because existing law provides sufficient flexibility to conduct a searching examination of each agency's budget, and because SB 1 unnecessarily imposes new bureaucracy and restrictions on the Executive function of submitting budget requests, **I VETO SB 1**. I have already committed to work with supporters of the legislation to formalize Executive Branch policies that are consistent with the goals of this legislation.

**SB 148** started in its original form as a bill I supported – it required regular analysis of regulatory boards within the Secretary of State's office and recommendations to the General Assembly regarding elimination of boards that are no longer necessary.  That language also passed in SB 149, which I have signed. Unfortunately, during the legislative process, the text of HB 236 was added to SB 148. This language creates a "Legislative Sunset Advisory Subcommittee" of the General Assembly, which would regularly review all statutory state agencies to determine if they should continue to operate.  Any agency reviewed by this subcommittee would automatically be repealed the following July unless the General Assembly took action to continue the agency (although the legislation confusingly also provides that no agency would be repealed until all responsibilities, statutory, financial, or otherwise, were affirmatively transferred by the General Assembly to another agency). The General Assembly already has full authority to pass legislation eliminating any statutory state agency, and also has full authority to reduce the budget of any agency to zero. This bill is unnecessary and unworkable, and fraught with potential for unintended consequences. For instance, when any substantial agency was up for review and was determined to warrant retention, the bill continuing that agency would be a must-pass bill. Such bills tend to be inviting targets for unrelated amendments that could not pass on their own, leaving future governors with the unappealing choice of signing a bill containing terrible policy or vetoing it and eliminating a necessary agency. Moreover, the bill violates separation of powers by constraining the discretion of the Executive Branch in submitting future budget requests; appropriating funds in response to a budget request from an Executive Branch agency is a Legislative function, but making the requests is an Executive function. Although I strongly believe it is vital regularly to assess the value each part of state government provides taxpayers, and have supported the elimination of certain agencies throughout my terms as Governor, I do not believe that SB 148 actually accomplishes its goal and instead creates substantial risk for unintended consequences. Accordingly, **I VETO SB 148**. I have already committed to work with supporters of the legislation to formalize Executive Branch policies that are consistent with the goals of this legislation.

**SB 374** creates a "Legislative Economic Development Council", and grants to that council (composed of members of the General Assembly) certain powers Executive in nature over the State's economic development activities. This violates the constitutionally required separation of powers. "[A] member of the General Assembly cannot discharge the duties or exercise the functions of an agency within the executive branch of state government." 1988 Atty Gen. Op. Ga. 31. Accordingly, **I VETO SB 374**.

**SB 480** creates a State Council of Economic Advisors that the Governor will be required to consult in preparing a revenue estimate for budgetary purposes. "[T]he Constitution clearly separates the respective functions of the executive and legislative branches of State Government with respect to appropriations. The language and structure of the Constitution leave no conclusion other than that it is the exclusive function of the executive branch to prepare a budget report, including therein the revenue estimate...." 1979 Op. Att'y Gen. Ga. 40 (1979).  Although I have used a council of economic advisors to assist me in the preparation of my revenue estimate, and believe that this is a wise course of action, I also believe that future governors are entitled to determine for themselves from whom to seek counsel on such matters. Accordingly, **I VETO SB 480**.

## Local Legislation

**SB 539** modifies membership to the McPherson Implementing Local Redevelopment Authority. The current structure of the MILRA is sound and any attempt to convert ex-officio members to voting members would only cause disruption to the dynamics of this working board. For this reason, **I VETO SB 539**.

**SB 547** is local legislation applicable to the City of St. Mary's in Camden County. A member of the City's legislative delegation and local officials requested a veto because of the adverse effects that this bill will have on the City's financial stability. In addition, the City was not consulted before this legislation was introduced. For these reasons, **I VETO SB 547.**

**HB 1422** is local legislation applicable to Montgomery County. Due to technical errors in the legislation, the sponsor of the bill and the local officials requested that it be vetoed. **I therefore VETO HB 1422**.

**HB 1465** is local legislation applicable to the City of College Park in Fulton County. This legislation creates a Water and Sewer Authority that would have the power to construct infrastructure and serve constituents both inside and outside the corporate limits of the City of College Park. The Constitution requires legislation with extra-local effect to be general legislation, not local.  For this reason, **I VETO HB 1465**.

**HB 1478** is local legislation applicable to the City of Dexter in Laurens County. This legislation annexes an unincorporated area of the County into the City. The Laurens County Commission requested this bill be vetoed because the County was not given notice of the annexation or consulted as to the implications of service delivery to the area in question. Further, the unincorporated area being annexed is not contiguous to the City of Dexter's current corporate limits. For these reasons, **I VETO HB 1478**.

### # # #