IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| AMERICA'S HEALTH INSURANCE PLANS,<br><br>    **Plaintiff,**<br><br>  v.<br><br>RALPH T. HUDGENS, in his official capacity as Georgia Insurance and Safety Fire Commissioner,<br><br>    **Defendant.** | **1:12-cv-2978-WSD** |

## OPINION AND ORDER

This matter is before the Court on Plaintiff's Motion for a Preliminary Injunction [4] and Defendant's Motion to Dismiss Complaint [22].

## I. BACKGROUND

Plaintiff America's Health Insurance Plans ("AHIP") challenges the validity of certain provisions of Georgia statutes, regulating the timeliness of the payment of claims submitted to "self-funded" employer health benefit plans, on the ground that the statutes are preempted by the federal Employee Retirement Income Security Act of 1974 ("ERISA"). Defendant Ralph T. Hudgens ("Commissioner"), the Georgia Insurance and Fire Safety Commissioner, is sued in his official capacity because he is charged with the enforcement of the challenged statutes.

A.      Overview of ERISA and Employer Self-Funded Health Plans

ERISA is a comprehensive statute that "subjects to federal regulation plans providing employees with fringe benefits." Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 90 (1983). See generally ERISA, Pub. L. No. 93-406, 88 Stat. 829 (1974) (codified as amended at 29 U.S.C. §§ 1001–3058). ERISA governs both "pension plans" and "welfare plans," and it is "designed to promote the interests of employees and their beneficiaries in employee benefit plans." Shaw, 463 U.S. at 90. It achieves its purpose by "set[ting] various uniform standards, including rules concerning reporting, disclosure, and fiduciary responsibility, for both pension and welfare plans." See id. at 91.

Among the "welfare plans" governed by ERISA are health benefit plans (i.e., employer-offered health insurance). See 29 U.S.C. § 1002(1) (2006). There are two general types of employer health benefit plans: "insured" plans and "self-funded" plans. In insured plans, employers purchase a health insurance policy to cover the plan's members. In self-funded plans, employers pay the plan members' claims. See generally David Goldin, Survey, *External Review Process Options for Self-Funded Health Insurance Plans*, 2011 Colum. Bus. L. Rev. 429, 440–41. ERISA plans are administered by a "fiduciary," which exercises "discretionary authority" over the plan. See 29 U.S.C. § 1002(21)(A). In most cases, the

employer offering the plan acts as the "fiduciary."  See Baker v. Big Star Div. of the Grand Union Co., 893 F.2d 288, 290 (11th Cir. 1989).  An employer who offers a self-funded plan usually contracts with a third-party administrator ("TPA"), often an insurance company, to provide administrative or non-fiduciary services to the plan.  Goldin, supra, at 440.

      B.    Overview of Challenged Statutes

Under the traditional health insurance model, patient-insureds pay premiums, medical providers treat patients and then submit treatment claims to health insurers, and the insurers pay the claims.  See Michael Flynn, *The Check Isn't in the Mail: The Inadequacy of State Prompt Pay Statutes*, 10 DePaul J. Health Care L. 397, 401 (2007).  As the doctor-patient relationship became increasingly dependent on this health insurance model, commentators noted increasing abuses in claim processing by insurers—from denying claims outright, to paying less on the amounts submitted, to simply ignoring claims.  See id. at 399–400.  One such abuse is the delay in paying claims, by months and even years.  See id. at 400.  When an insurer delays payment on a claim, it can "gain money on the float."  Id.  In other words, the longer an insurer withholds paying a claim, the longer the insurer can invest and make use of the amounts it owes on the claim.  See id.  This practice takes a toll on providers, sometimes to the extent of forcing

3

doctors to take out loans to keep their offices open or requiring them to seek bankruptcy protection.  See id. at 402.

Beginning in the early 1980s, state legislatures responded to these insurer late payment tactics with various types of "prompt pay" legislation, including by requiring insurers to pay claims within prescribed time periods or face various penalties.[1]  See id. at 403–07.  In 1999, the Georgia General Assembly enacted its "Prompt Pay Statute" (the "1999 Prompt Pay Statute").  See Act of April 19, 1999, No. 263, § 2, 1999 Ga. Laws 289, 290–91 (codified as amended at O.C.G.A. § 33-24-59.5 (2005)).  It applied to both claims for direct payment by medical providers and claims for reimbursement by insureds.  See O.C.G.A. § 33-24-59.5(b)(1) (2005).  It specifically provided that (i) benefits under a "health benefit plan" are payable by the "insurer" obligated under the plan and (ii) after receiving all necessary documentation relevant to the claim, the "insurer" has "15 working days within which to process and either mail payment for the claim or a letter or notice denying it."  Id.  Failure to process and pay (or deny) the claim in the time required

[1] In 1982, the Georgia General Assembly enacted its first requirements to facilitate the timely payment of claims by insurance companies by requiring health insurance policies to include terms stating that claims are "payable immediately upon receipt" and that claim denials must be made within 15 working days.  See Act of April 16, 1982, No. 338, § 5, 1982 Ga. Laws 1678, 1684 (codified as amended at O.C.G.A. § 33-29-3(b)(8), (d) (2005)).  These requirements are not at issue in this action.

obligated the "insurer" to pay 18 percent per annum interest on the outstanding balance.  Id. § 33-24-59.5(c).

An "insurer" under the 1999 Prompt Pay Statute included "accident and sickness insurers," and thus applied to the health insurance companies issuing policies to ERISA-regulated insured health plans.  See id. § 33-24-59.5(a)(3), (b)(1).[2]  The 1999 Prompt Pay Statute's definition of "insurer" expressly excluded

---

[2] An "insurer" under the 1999 Prompt Pay Statute was defined as:

> an accident and sickness insurer, fraternal benefit society, nonprofit hospital service corporation, nonprofit medical service corporation, health care corporation, health maintenance organization, provider sponsored health care corporation, or any similar entity and any self-insured health benefit plan not subject to the exclusive jurisdiction of the federal Employee Retirement Income Security Act of 1974, 29 U.S.C. Section 1001, et seq., which entity provides for the financing or delivery of health care services through a health benefit plan, or the plan administrator of any health benefit plan established pursuant to Article 1 of Chapter 18 of Title 45.

Id. § 33-24-59.5(a)(3).  A "health benefit plan" under the statute was defined as:

> any hospital or medical insurance policy or certificate, health care plan contract or certificate, qualified higher deductible health plan, health maintenance organization subscriber contract, any health benefit plan established pursuant to Article 1 of Chapter 18 of Title 45, or any dental or vision care plan or policy, or managed care plan; but health benefit plan does not include policies issued in accordance with Chapter 31 of this title; disability income policies; or Chapter 9 of Title 34, relating to workers' compensation.

Id. § 33-24-59.5(a)(2).

ERISA-regulated self-funded plans.  See id.  Thus, the 1999 Prompt Pay Statute

applied to insured ERISA plans but not to self-funded ERISA plans.  See id.

The evidence submitted with the pending motions shows that, from the

enactment of the 1999 Prompt Pay Statute to 2011, the percentage of workers

covered nationwide by self-funded plans increased from 44% to 60%.  (Comm'r's

Ex. B [21] at 41; Med. Ass'ns' Ex. C [18-3] at 3.)  In Georgia, the percentage now

may be as high as 65%.  (Med. Ass'ns' Ex. B [18-2] ¶ 19, at 6.)  This trend has

significantly eroded the number of plans that are subject to the requirements of the

1999 Prompt Pay Statute.  (See id.)

In April 2011, to address the eroded application of the 1999 Prompt Pay

Statute to payors of healthcare claims, the General Assembly enacted the Insurance

Delivery Enhancement Act of 2011 ("IDEA").  IDEA amends a variety of Georgia

statutes governing health insurance, including the 1999 Prompt Pay Statute.  See

Insurance Delivery Enhancement Act of 2011, No. 196, 2011 Ga. Laws 595

[hereinafter IDEA]; see also H.B. 167, 151st Gen. Assemb., Reg. Sess. (Ga. 2011)

(showing line-by-line amendments), available at http://www.legis.ga.gov/

Legislation/20112012/116210.pdf.  Several provisions of Sections 4, 5, and 6 of

IDEA, which take effect on January 1, 2013, extend the requirements of the 1999

Prompt Pay Statute to self-funded health plans.  See IDEA §§ 4–6, 7(b), 2011 Ga.

Laws at 596–600.[3]

Section 4 of IDEA amends Section 33-23-100 of the Georgia Code, a statute

governing the licensure of insurance "administrators."  The Act expands the

definition of "administrator" to include entities that provide claims processing

services "on behalf of a single or multiple employer self-insurance health plan."

H.B. 167 § 4 (amending O.C.G.A. § 33-23-100(a)(1)).  It deletes a provision

exempting from licensure an "entity that acts solely as an administrator of one or

more bona fide employee benefit plans established by an employer or an employee

organization, or both, for whom the insurance laws of this state are preempted

pursuant to [ERISA]."  Id. (amending O.C.G.A. § 33-23-100(b)(12)).  Section 4

---

[3] In 2010, both houses of the General Assembly passed, by wide margins, legislation nearly identical to IDEA (entitled the Insurance Delivery Enhancement Act of 2009) in a similar attempt to bring self-funded health plans within the Prompt Pay Statute.  See Ga. Gen. Assembly, *2009-2010 Regular Session - HB 321*, http://www.legis.ga.gov/ Legislation/en-US/display/20092010/HB/321 (last visited Dec. 10, 2012).  The then-Governor of Georgia vetoed the legislation because, in his view, ERISA preempted it.  Id.; Press Release, Gov. Sonny Perdue, Governor Perdue Signs Bill Clarifying Georgia's Gun Laws (June 8, 2010) (AHIP's Ex. 2 [4-3]) ("Because the Supremacy Clause of the United States Constitution precludes state law from violating federal law, I will not sign a bill that contravenes ERISA.  Accordingly, I VETO HB 321.").  The legislation was reintroduced in the next session, and, again, both houses passed it by wide margins.  See Ga. Gen. Assembly, *2011-2012 Regular Session - HB 167*, http://www.legis.ga.gov/Legislation/en-US/display/20112012/HB/167 (last visited Dec. 10, 2012).  The current Governor of Georgia signed the bill.

adds a new subsection to the licensure statute providing that "administrators" are

subject to the 1999 Prompt Pay Statute, as amended.  Id. (adding § 33-23-100(f)).[4]

Section 5 of IDEA specifically amends the 1999 Prompt Pay Statute

(O.C.G.A. § 33-24-59.5).  Section 5 changes the substantive requirements of the

statute by establishing a deadline, of 15 days for electronic claims and 30 days for

paper claims, for processing and paying (or denying) a claim.  See id. § 5

(amending O.C.G.A. § 33-24-59.5(b)(1)).  It also reduces, from 18 to 12 percent,

the interest rate on untimely payments.  See id. § 5 (amending O.C.G.A. § 33-24-

59.5(c)).  It adds a provision authorizing the Commissioner to impose

"administrative penalties" on insurers that fail to timely process at least 95 percent

of claims in a quarter.  See id. (adding O.C.G.A. § 33-24-59.5(d)).

Section 5 also amends certain statutory definitions.  It amends the definition

of "health benefit plan" to include a "self insured plan."  Id. § 5 (amending

---

[4] The new subsection (f) broadly applies, with one narrow exception, the Prompt
Pay Statute to "administrators."  The exception provides: "An administrator shall
be subject to Code Sections 33-24-59.5 and 33-24-59.14 unless the administrator
provides sufficient evidence that the self-insured health plan failed to properly fund
the plan to allow the administrator to pay any outside claim."  IDEA § 4, 2011 Ga.
Laws at 598 (adding O.C.G.A. § 33-23-100(f)).

O.C.G.A. § 33-24-59.5(a)(2)).[5]  It changes the definition of "insurer" by

(i) deleting the express exemption for ERISA-regulated self-funded plans,

(ii) adding "the plan administrator of any health plan" and "any other administrator

as defined in . . . Code Section 33-23-100," and (iii) specifically including "any

self-insured health benefit plan" and any entity that "provides for the financing or

delivery of health care services through a health benefit plan."  Id. (amending

O.C.G.A. § 33-24-59.5(a)(3)).[6]

---

[5] The full amended definition of "health benefit plan" is:

> "Health benefit plan" means any hospital or medical insurance policy
> or certificate, health care plan contract or certificate, qualified higher
> deductible health plan, health maintenance organization subscriber
> contract, any health benefit plan established pursuant to Article 1 of
> Chapter 18 of Title 45, or any dental or vision care plan or policy, or
> managed care plan or self-insured plan; but health benefit plan does
> not include policies issued in accordance with Chapter 31 of this title;
> disability income policies; or Chapter 9 of Title 34, relating to
> workers' compensation.

IDEA § 5, 2011 Ga. Laws at 598 (amending O.C.G.A. § 33-24-59.5(a)(2)).

[6] The full amended definition of "insurer" is:

> "Insurer" means an accident and sickness insurer, fraternal benefit
> society, nonprofit hospital service corporation, nonprofit medical
> service corporation, health care corporation, health maintenance
> organization, provider sponsored health care corporation, or any
> similar entity and any self-insured health benefit plan, which entity
> provides for the financing or delivery of health care services through a
> health benefit plan, the plan administrator of any health plan, or the

Section 6 of IDEA creates a new section of the Georgia Code: O.C.G.A.

§ 33-24-59.14 ("Section 59.14"). See H.B. 167 § 6. The new section is nearly, but

not completely, identical to the 1999 Prompt Pay Statute, as amended by IDEA

(O.C.G.A. § 33-24-59.5) ("Section 59.5"). Section 59.14 expressly adopts Section

59.5's definitions of "benefits" and "health benefits plan." H.B. 167 § 6 (adding

O.C.G.A. § 33-34-59.14(a)(2), (4)). Section 59.14 also defines one relevant term

not defined in Section 59.5: "administrator." See id. (adding § 33-34-59.14(a)(1)).[7]

"Administrator" is defined by cross-reference to Section 33-23-100 of the Georgia

Code (as amended by Section 4 of IDEA). See id. (adding § 33-34-59.14(a)(1)).

Unlike Section 59.5, Section 59.14's definition of "insurer" does not include "any

self-insured health benefit plan" or "any other administrator as defined in

paragraph (1) of subsection (a) of Code Section 33-23-100." Compare id. § 5

(amending § 33-34-59.5(a)(3)) with id. § 6 (adding § 33-34-59.14(a)(6)). (The

latter provision is Section 59.14's definition of "administrator.") The substantive

---

> plan administrator of any health benefit plan established pursuant to
> Article 1 of Chapter 18 of Title 45 or any other administrator as
> defined in paragraph (1) of subsection (a) of Code Section 33-23-100.

IDEA § 5, 2011 Ga. Laws at 598 (amending O.C.G.A. § 33-24-59.5(a)(3)).

[7] Section 6 also includes two other definitions—for "facility" and "health care
provider"—that are not implicated in this action. See H.B. 167 § 6 (adding § 33-
34-59.14(a)(3), (5))

requirements of Sections 59.5 and 59.14 are the same, except that Section 59.14's requirements apply to both "insurers" and "administrators."  For purposes of this Order, the Court considers both Sections 59.5 and 59.14[8] in interpreting the 1999 Prompt Pay Statute, as amended by IDEA.

C.    Parties

AHIP is a national trade association that represents companies that provide, and administer, health insurance to insured employer health plans and that provide administrative services, including claims processing, to self-funded employer health plans.[9]  (Compl. [1] ¶¶ 11–12.)  In providing services to self-funded employer health plans, AHIP's members serve as TPAs.  (See id.)  AHIP alleges that, to comply with the 1999 Prompt Pay Statute, as amended by IDEA, its members have incurred, and will continue to incur, costs, including increased employee time, to modify their claims processing systems, to monitor compliance, and to prepare quarterly reports to Georgia regulators.  (Id. ¶¶ 13–15; AHIP's Ex. 3 [4-4] ¶¶ 8–14.)

---

[8] The Court uses the terms "Sections 59.5" and "Section 59.14" here to clearly identify the results of the IDEA amendments to these Georgia Code sections.

[9] Most people would recognize AHIP's members as health insurance companies.

The Commissioner is charged with enforcing the Prompt Pay Statute,[10] and when the challenged provisions of IDEA take effect, the Commissioner will have the authority to impose administrative penalties on "insurers" that fail to comply with the requirements of the amended Prompt Pay Statute.  (Compl. ¶ 18.)  See IDEA § 5 (adding O.C.G.A. § 33-24-59.5(d)).

D.    Procedural History

On August 28, 2012, AHIP filed its Complaint seeking a declaratory judgment that ERISA preempts Sections 4, 5, and 6 of IDEA, as applied to ERISA-regulated self-funded health plans and their administrators, and an injunction prohibiting the Commissioner from enforcing Sections 4, 5, and 6 of IDEA against ERISA-regulated self-funded health plans and their administrators.  AHIP contends that Section 514(a) of ERISA expressly preempts the challenged IDEA provisions.  Alternatively, AHIP contends that both a Department of Labor regulation, governing claims processing procedures, and Section 502(a) of ERISA, prescribing civil enforcement remedies, conflict with, and therefore preempt, the challenged provisions.

_____

[10] For the purposes of further discussion in this opinion, the 1999 Prompt Pay Statute, as amended by IDEA, will simply be referred to as the "Prompt Pay Statute."

On September 14, 2012, AHIP filed its Motion for Preliminary Injunction to enjoin the Commissioner from enforcing the challenged IDEA provisions, scheduled to take effect January 1, 2013.  On October 12, 2012, the Commissioner filed his opposition to the Motion for Preliminary Injunction.[11]

On October 12, 2012, the Commissioner also filed his Motion to Dismiss seeking dismissal of the action on the grounds that the Court lacks subject matter jurisdiction and that AHIP's Complaint fails to state a claim for relief.  The Commissioner argues that AHIP's claim is not justiciable because AHIP lacks standing, and because the claim is not ripe.  The Commissioner further argues that AHIP has not demonstrated that the Court has diversity jurisdiction over this matter and that the Tax Injunction Act deprives the Court of jurisdiction.  The Commissioner contends that AHIP fails to state a claim upon which relief can be granted because, in seeking a preemption declaration, AHIP has not asserted

---

[11] On October 12, 2012, the American Medical Association ("AMA") and the Medical Association of Georgia ("MAG") filed a joint motion to intervene as defendants in this matter [14], along with a "proposed" opposition to the Motion for Preliminary Injunction [18].  The Court allows AMA and MAG's "proposed" opposition as an *amicus curiae* brief in opposition to the Motion for Preliminary Injunction.  On November 14, 2012, the Georgia Chamber of Commerce filed its motion for leave to file an *amicus curiae* brief [39], along with the proposed brief [39-1], in support of the Motion for Preliminary Injunction.  On November 16, 2012, the Court granted the Chamber of Commerce's motion [41] and allowed its brief to be docketed [42].

cognizable causes of action and AHIP's claims are barred by the Eleventh Amendment.

The Commissioner further argues that, as a matter of law, ERISA does not preempt the challenged provisions of IDEA.  The Commissioner essentially advances two arguments to support his position.  First, he argues that IDEA was carefully drafted not to apply to self-funded plans themselves but only to such plans' TPAs and, because TPAs are not ERISA fiduciaries and are not directly governed by ERISA, the State of Georgia may regulate claims processing by TPAs.  Second, the Commissioner argues that the Prompt Pay Statute governs only a ministerial function—the required timing for paying or denying claims—to which ERISA's express preemption provision does not apply and which does not conflict with any existing requirements of ERISA or ERISA regulations.

On October 26, 2012, AHIP filed its opposition to the Motion to Dismiss.[12] On November 20, 2012, the Court conducted a hearing on AHIP's Motion for Preliminary Injunction and the Commissioner's Motion to Dismiss.

---

[12] On October 12, 2012, AMA and MAG filed a "joinder" in the Commissioner's Motion to Dismiss [19] in which they join the argument that AHIP's claims are not ripe.  As AMA and MAG's motion to intervene remains pending, the Court allows AMA and MAG's filing as an *amicus curiae* brief in support of the Motion to Dismiss.

## II.   COMMISSIONER'S MOTION TO DISMISS

### A.   Legal Standards

#### 1.   *Rule 12(b)(1) Motion to Dismiss for Lack of Subject Matter Jurisdiction*

A motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure may be either a "facial" or "factual" attack.  Morrison v. Amway Corp., 323 F.3d 920, 924–25 n.5 (11th Cir. 2003).  A facial attack challenges subject matter jurisdiction on the basis of the allegations in the complaint, and the Court takes the allegations as true in deciding whether to grant the motion.  Id.  Factual attacks challenge subject matter jurisdiction in fact, irrespective of the pleadings.  Id.  When resolving a factual attack, the Court may consider extrinsic evidence such as testimony and affidavits. Id.  The Commissioner does not state whether he is making a "facial" or "factual" attack.  The parties have cited both the allegations in the Complaint and extrinsic evidence in their briefs, and the Court considers the Motion to Dismiss to be a "factual" attack.

#### 2.   *Rule 12(b)(6) Motion to Dismiss for Failure to State a Claim*

On a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court must "assume that the factual allegations in the complaint are true and give the plaintiff[] the benefit of reasonable factual

inferences." Wooten v. Quicken Loans, Inc., 626 F.3d 1187, 1196 (11th Cir. 2010), cert. denied, 132 S. Ct. 245 (2011). Although reasonable inferences are made in the plaintiff's favor, "'unwarranted deductions of fact' are not admitted as true." Aldana v. Del Monte Fresh Produce, N.A., 416 F.3d 1242, 1248 (11th Cir. 2005) (quoting S. Fla. Water Mgmt. Dist. v. Montalvo, 84 F.3d 402, 408 n.10 (1996)). Similarly, the Court is not required to accept conclusory allegations and legal conclusions as true. See Am. Dental Ass'n v. Cigna Corp., 605 F.3d 1283, 1290 (11th Cir. 2010) (construing Ashcroft v. Iqbal, 556 U.S. 662 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007)).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 570)). Mere "labels and conclusions" are insufficient. Twombly, 550 U.S. at 555. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556). This requires more than the "mere possibility of misconduct." Am. Dental, 605 F.3d at 1290 (quoting Iqbal, 556 U.S. at 679). The well-pled allegations must "nudge[] their claims

across the line from conceivable to plausible." Id. at 1289 (quoting Twombly, 550 U.S. at 570).

    B.    Analysis

        1.    *Lack of Jurisdiction: Justiciability*

The Commissioner argues that the Court lacks jurisdiction over this matter because AHIP's claims are not justiciable. Article III of the United States Constitution provides that the judicial power of the federal courts extends only to "cases" and "controversies." U.S. Const. art. III, § 2, cl. 1. It is well-settled that this limited extension of power imposes substantive constitutional constraints on the power of federal courts to resolve legal disputes. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992). The three "strands of justiciability" that "go to the heart of the Article III case or controversy requirement" are standing, ripeness, and mootness. Harrell v. Fla. Bar, 608 F.3d 1241, 1247 (11th Cir. 2010). The Commissioner argues that AHIP lacks standing to challenge IDEA, and that its claims are not ripe.

The doctrine of standing is a fundamental boundary of the judicial power to decide cases and controversies. Lujan, 504 U.S. at 560. "[T]he question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." Warth v. Seldin, 422 U.S. 490, 498 (1975). This is

a threshold issue in every federal case.  Id.  Under recent formulations of the

standing doctrine, "[a] plaintiff who invokes the jurisdiction of a federal court

bears the burden to show (1) an injury in fact, meaning an injury that is concrete

and particularized, and actual or imminent, (2) a causal connection between the

injury and the [challenged] conduct, and (3) a likelihood that the injury will be

redressed by a favorable decision."  CAMP Legal Defense Fund, Inc. v. City of

Atlanta, 451 F.3d 1257, 1269 (11th Cir. 2006) (internal quotation marks omitted).

Standing "must be supported in the same way as any other matter on which the

plaintiff bears the burden proof," that is, "with the manner and degree of evidence

required at the successive stages of the litigation."  CAMP, 451 F.3d at 1269

(quoting Lujan, 504 U.S. at 561).  Where, as here, "standing becomes an issue on a

motion to dismiss, general factual allegations of injury resulting from the

defendant's conduct may be sufficient to show standing."  Bischoff v. Osceola

Cnty., 222 F.3d 874, 878 (11th Cir. 2000).

   The second and third prongs of the standing inquiry are not at issue here.  If

AHIP has alleged a judicially cognizable injury under the first prong, it is caused

by the threat of enforcement of the challenged provisions of IDEA, and a

declaration that the provisions are preempted would redress the injury by allowing

AHIP's members, on whose behalf this action is asserted, to provide plan services

without fear of civil or criminal penalties.  Cf. N.H. Right to Life Political Action Comm. v. Gardner, 99 F.3d 8, 13 (1st Cir. 1996) (holding that, in pre-enforcement challenge to statute on First Amendment grounds, dispositive inquiry was presence of injury-in-fact, because any injury was traceable to challenged statute and declaratory relief against government officials would redress the injury).  The issue, therefore, is whether AHIP has adequately alleged an actual injury-in-fact.

AHIP asserts standing in this action on behalf of its members.  "[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  Doe v. Stincer, 175 F.3d 879, 882 (11th Cir. 1999) (quoting Hunt v. Wash. State Advertising Comm'n, 432 U.S. 333, 343 (1977)). The Commissioner challenges AHIP's associational standing only on the first prong, arguing that AHIP has not shown that any of its members would have standing in its own right because AHIP has not alleged that any member has suffered a cognizable "injury."[13]

---

[13] The Commissioner also argues that standing is lacking because AHIP's Complaint does not identify any individual member.  This is not a requirement for associational standing; AHIP may assert standing on behalf of its members without

The Eleventh Circuit has explained that, in "a preenforcement, constitutional challenge to a state statute, the injury requirement may be satisfied by establishing 'a realistic danger of sustaining direct injury as a result of the statute's operation or enforcement.'  A plaintiff may meet this standard in any of three ways: '(1) [the plaintiff] was threatened with application of the statute; (2) application is likely; or (3) there is a credible threat of application.'"  Ga. Latino Alliance for Human Rights v. Governor of Ga., 691 F.3d 1250, 1257–58 (11th Cir. 2012) (alteration in original) (citations omitted) (quoting Socialist Workers Party v. Leahy, 145 F.3d 1240, 1245 (11th Cir. 1998)).  In applying this test the Court notes that the parties do not dispute that the challenged IDEA provisions apply to AHIP's members, and AHIP has alleged that its members already have incurred costs, and will incur future costs, to prepare to meet the Act's requirements.  Economic injury is sufficient to establish standing.  See, e.g., Ga. Hosp. Ass'n v. Dep't of Med. Assistance, 528 F. Supp. 1348, 1352 (N.D. Ga. 1982).  When the IDEA amendments to the Prompt Pay Statute take effect on January 1, 2013, AHIP's members will be faced with the choice of complying with its requirements, which impose direct and indirect costs, or ignoring it, which will expose them to penalties

---

identifying them.  See Stincer, 175 F.3d at 882 ("Nor must the association name the members on whose behalf suit is brought.").

imposed by the Commissioner.  The Commissioner has publicly announced his

intention to enforce the amended Prompt Pay Statute,[14] and the Court finds that

application of the statute to AHIP's members "is likely."  See Ga. Latino Alliance,

691 F.3d at 1257–58.  The Court concludes that AHIP has standing in this action.

 The Commissioner also argues that this case is not justiciable because

AHIP's claims are not ripe.  The ripeness inquiry asks "whether there is sufficient

injury to meet Article III's requirement of a case or controversy and, if so, whether

the claim is sufficiently mature, and the issues sufficiently defined and concrete, to

permit effective decisionmaking by the court."  Socialist Workers, 145 F.3d at

1244 (quoting Digital Props., Inc. v. City of Plantation, 121 F.3d 586, 589 (11th

Cir. 1997)).  In pre-enforcement challenges to state laws, "the lines among the

justiciability doctrines tend to blur" because "the ripeness query merges into the

injury inquiry performed in the standing analysis."  Id. at 1244–45; see also Nat'l

Treasury Emps. Union v. United States, 101 F.3d 1423, 1428 (D.C. Cir.1996)

("[I]f a threatened injury is sufficiently 'imminent' to establish standing, the

constitutional requirements of the ripeness doctrine will necessarily be satisfied.").

The Court has concluded that AHIP faces "a realistic danger of sustaining direct

---

[14] In October 2012, the Commissioner stated that he intends to "enforce [IDEA]."
(AHIP's Ex. A [28-1] at 3.)

injury as a result of the [Prompt Pay Statute]'s operation or enforcement," see Ga. Latino Alliance, 691 F.3d at 1257–58, and the Court also concludes that AHIP has asserted a "sufficiently mature," and thus ripe, claim.  See Socialist Workers, 145 F.3d at 1244.

2.   *Lack of Jurisdiction: Tax Injunction Act*

The Commissioner next argues that the Court lacks jurisdiction because of the Tax Injunction Act, which prohibits a district court from "enjoin[ing], suspend[ing] or restrain[ing] the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State."  See 28 U.S.C. § 1341 (2006).  Specifically, the Commissioner contends that "fees, fines, and assessments" levied under the Prompt Pay Statute are "taxes" under the Tax Injunction Act.  The Court disagrees.  A state law is a "tax" if its purpose is to raise revenue and not to regulate activity.  Miami Herald Publ'g Co. v. City of Hallandale, 734 F.2d 666, 670 (11th Cir. 1984) ("[T]o the extent the statute challenged is regulatory rather than revenue raising in purpose, the measure does not constitute a tax, and the district court retains jurisdiction.").  As the Commissioner has noted in his briefs, the purpose of IDEA is "to address the growing problem of [TPAs] of health benefits plans not paying medical claims in a timely manner."  (Comm'r's Br. [21] at 4; Comm'r's Br. [22] at 2.)  The Act

22

accomplishes this goal by compelling, with threat of penalties, compliance with the Prompt Pay Statute.  The Commissioner has not argued, and has not demonstrated, that the purpose of any of the challenged provisions is to raise revenue for the state.  Cf. Retail Indus. Leaders Ass'n v. Fielder, 475 F.3d 180, 189 (4th Cir. 2007) (holding that a state law designed to compel certain action was not a "tax").  The Court concludes that the Tax Injunction Act does not deprive the Court of jurisdiction over this matter.[15]

      3.    *Failure to State a Claim: Cognizable Cause of Action*

The Commissioner next argues that AHIP's Complaint fails to state a claim because there is no private right of action for preemption.  Earlier this year, the Eleventh Circuit held that a plaintiff does "have an implied right of action to assert a preemption claim seeking injunctive . . . relief."  Ga. Latino Alliance, 691 F.3d at 1262 (omission in original) (quoting Planned Parenthood of Houston & Se. Tex. v.

---

[15] The Commissioner also argues that the Court lacks diversity jurisdiction because AHIP has not established that the amount in controversy exceeds the statutory threshold.  There is no dispute that this Court has federal question jurisdiction over this matter.  See Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 96 n.14 (1983) ("A plaintiff who seeks injunctive relief from state regulation, on the ground that such regulation is pre-empted by a federal statute which, by virtue of the Supremacy Clause of the Constitution, must prevail, . . . presents a federal question which the federal courts have jurisdiction under 28 U.S.C. § 1331 to resolve.").

Sanchez, 403 F.3d 324, 334 n.47, 335 (5th Cir. 2005)).[16]  The Court concludes that

AHIP has asserted cognizable causes of action.[17]

### 4.   *Failure to State a Claim: Preemption of IDEA*

The Commissioner last argues that AHIP's Complaint fails to state a claim

because, as a matter of law, ERISA does not preempt the challenged provisions of

IDEA.  Under the Supremacy Clause, when a state law conflicts, or is

incompatible, with federal law, federal law preempts the state law.  Teper v.

Miller, 82 F.3d 989, 993 (11th Cir. 1996); see also U.S. Const. art. VI, § 2.

Preemption generally arises under three circumstances: (1) where Congress has

expressly preempted state law ("express preemption"); (2) where Congress has

legislated so comprehensively that federal law occupies an entire field of

regulation and leaves no room for state law ("field preemption"); or (3) where

---

[16] In his briefs, the Commissioner acknowledged the holding in Georgia Latino Alliance but informed the Court that he was preserving the argument because a petition for rehearing *en banc* had been filed in that case.  On November 27, 2012, the Court of Appeals denied the petition.

[17] The Commissioner argues further that, because AHIP has not asserted cognizable causes of action for prospective relief, AHIP's claims against the Commissioner are barred by the Eleventh Amendment.  Because the Court concludes that AHIP has asserted cognizable claims, the Court concludes that, under the doctrine of Ex parte Young, the claims are not barred by the Eleventh Amendment.  See, e.g., Summit Med. Associs., P.C. v. Pryor, 180 F.3d 1326, 1338 (11th Cir. 1999) (explaining that Ex parte Young allows pre-enforcement challenges, seeking prospective relief, to unconstitutional state laws).

federal law conflicts with state law such that it is impossible to comply with both

or that the state law stands as an obstacle to the objective of the federal law

("conflict preemption").  United States v. Alabama, 691 F.3d 1269, 1281 (11th Cir.

2012) (citing Fla. State Conf. of NAACP v. Browning, 522 F.3d 1153, 1167 (11th

Cir. 2008)).

AHIP alleges that express and conflict preemption apply here because

Section 514 of ERISA expressly preempts state laws that "relate to" ERISA plans

and because a Department of Labor regulation and ERISA's civil enforcement

remedies conflict with IDEA.  The Commissioner argues that neither express nor

conflict preemption applies to IDEA.  He argues specifically that ERISA does not

preempt IDEA because the IDEA amendments extend the requirements of the

Prompt Pay Statute to TPAs of self-funded ERISA plans, which are not generally

considered to be fiduciaries of ERISA plans are not governed directly by ERISA.

See Baker v. Big Star Div. of the Grand Union Co., 893 F.2d 288, 290 (11th Cir.

1989).  He further argues that the requirements imposed on TPAs by IDEA are

ministerial in nature and therefore do not "relate to" ERISA or conflict with any

provision of ERISA, or ERISA regulations.

In evaluating the parties' claims, the Court first reviews the Prompt Pay

Statute, as amended by IDEA, to determine, as the Commissioner argues, whether

25

IDEA only allows for the regulation of TPAs and does not otherwise impact self-funded employer health plans themselves.[18]  The Court then considers AHIP's preemption arguments.  In doing so, the Court is "guided by two cornerstones."  Id. at 1281–82 (quoting Wyeth v. Levine, 555 U.S. 555, 565 (2009)).  First, "the purpose of Congress is the ultimate touchstone in every pre-emption case."  Id. at 1282 (quoting Wyeth, 555 U.S. at 565).  Second, courts assume that "the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress."  Id. (quoting Wyeth, 555 U.S. at 565).[19]

---

[18] The Commissioner's written submissions focus on the argument that IDEA extended the Prompt Pay Statute to apply to TPAs of self-funded plans, which the Commissioner claims is permissible regulation because TPAs are not ERISA fiduciaries and thus regulation of them is not preempted.  The Commissioner's argument shifted at the November 20, 2012, hearing to a subset of this TPA argument.  Specifically, the Commissioner argued that IDEA simply now allows the state to regulate the payment timing activities of a TPA providing services to a self-funded plan.  (See infra note 21.)

[19] In its briefs and at the hearing on the pending motions, AHIP argued that three courts of appeals have concluded that ERISA preempts similar "prompt pay" legislation in other states: Schoedinger v. United Healthcare of the Midwest, Inc., 557 F.3d 872 (8th Cir. 2009), Ellis v. Liberty Life Assurance Co. of Boston, 394 F.3d 262 (5th Cir. 2004), and Cicio v. Does, 321 F.3d 83 (2d Cir. 2003).  A careful reading of those cases shows that the issues presented in them are not the same as the issues presented in this action.  See Schoedinger, 557 F.3d at 875–76 (involving ERISA preemption of remedies available to a medical provider in a private cause of action); Ellis, 394 F.3d at 274–78 (considering only whether an exception to ERISA's preemption provision applied to a private claim); Cicio, 321

a.  <u>The Effect of the IDEA Amendments and Whether They Are Limited to the Regulation of TPAs</u>

Section 4 of IDEA amends a statute governing the licensure of insurance "administrators."  IDEA § 4, 2011 Ga. Laws at 596–98 (amending O.C.G.A. § 33-23-100).  It effectively expands the licensure statute's definition of "administrator" to include TPAs of ERISA-regulated self-funded health plans.  <u>See</u> <u>id.</u>

Section 5 of IDEA amends the Prompt Pay Statute itself.  <u>Id.</u> § 5, 2011 Ga. Laws at 598–99 (amending O.C.G.A. § 33-24-59.5).  The effect of its changes is to extend the Prompt Pay Statute's requirements to all health insurance and health benefit plans, including non-ERISA plans, insured ERISA plans, and, for the first time, self-funded ERISA plans.  <u>See</u> <u>id.</u>  IDEA achieves this expansion of the Prompt Pay Statute's reach by amending the statutory definition of "insurer" broadly to include self-funded ERISA plans and the entities that administer and determine benefits under self-funded ERISA plans.  <u>See</u> <u>id.</u> (amending O.C.G.A. § 33-24-59.5(a)(3)).  Section 5 of IDEA specifically deletes the express exemption of self-funded ERISA plans from the former definition of "insurer."  <u>See</u> IDEA § 5, 2011 Ga. Laws at 598 (defining "insurer").  It then adds to the definition a list

_____

F.3d at 95 (involving ERISA preemption of a private cause of action).  This case appears to be the first direct challenge to the enforceability of "prompt pay" requirements on ERISA-regulated self-funded health plans.

of numerous types of entities, including "any self-insured health benefit plan," any

entity that "provides for the financing or delivery of health care services through a

health benefit plan [which includes a 'self-insured plan']," an "administrator as

defined in . . . Code Section 33-23-100," and a "plan administrator of any health

plan."[20]  When reading the Prompt Pay Statute and its IDEA amendments as a

coherent whole, it is clear that the Georgia General Assembly intended the term

"insurer" to broadly encompass all entities that make payments and benefit

determinations under health insurance and health benefit plans.  Thus, an "insurer"

under the Prompt Pay Statute now includes, and the amended statute's

requirements apply to, ERISA-regulated self-funded health plans, TPAs of such

plans, and any other entity involved in the payment and benefit determination

process.[21]

---

[20] This list of entities easily encompasses all of the actors that might play a part in
evaluating and paying a claim to a self-funded ERISA plan, including the plan
itself, the fiduciary of the plan, and the TPA of the plan.  See 29 U.S.C. § 1002(1)
(providing that ERISA "welfare plans" include self-funded health benefit plans);
id. § 1002(21)(A) (providing that a "fiduciary" includes an entity that "exercises
any authority or control respecting management or disposition of [an ERISA
plan's] assets" or "has any discretionary authority or discretionary responsibility in
the administration of [an ERISA] plan"); IDEA § 4, 2011 Ga. Laws at 596
(amending O.C.G.A. § 33-23-100) (defining "administrator" to include the TPA of
a self-funded ERISA plan).

[21] As noted above, the Commissioner argued that ERISA does not preempt IDEA
because (i) the IDEA amendments to the Prompt Pay Statute apply *only* to TPAs

and (ii) the state may regulate TPAs without running afoul of ERISA because, under <u>Baker</u>, TPAs are not ERISA fiduciaries or governed by ERISA.  The first part of the Commissioner's argument is at odds with the text of the IDEA amendments and the clear legislative intent to reach self-funded health plans, without regard to the specific entity receiving the claim.  <u>See</u> IDEA § 5, 2011 Ga. Laws at 598 (defining "insurer" as "any self-insured health benefit plan," an "entity [that] provides for the financing or delivery of health care services through a health benefit plan," "the plan administrator of any health plan," *and* a TAP under "Code Section 33-23-100").  At the hearing on the pending motions, the Commissioner's counsel conceded that the amended Prompt Pay Statute reaches any health plan entity to which a claim is submitted:

> THE COURT: [R]eally I think what you are saying is that it really doesn't—it's not really about third-party administrators.  It's about the function.  That we are—the state is allowed, irrespective of ERISA preemption and maybe even within the savings clause, that we are allowed, regardless of where the function is being performed, to regulate that because it doesn't relate to and it is insurance.

> MR. SPONSELLER: Yes.

> THE COURT: And whether an employee of Coca-Cola does that or whether the ABC Corporation in Morrow, Georgia, does that, we can regulate that?

> MR. SPONSELLER: Yeah.  The nature of what the statute requires, yes.

(<u>See</u> Tr. [44] 38:7–39:1.)  The second part of the Commissioner's argument is without support.  In <u>Baker</u>, the court found that TPAs usually (but not necessarily always) are not ERISA fiduciaries and are not governed by ERISA, and on that basis, held that a non-fiduciary TPA could not be liable for a claim under ERISA. 893 F.2d at 289–90.  <u>Baker</u> does not hold that ERISA cannot preempt a state law regulating non-fiduciary TPAs.  The real question before the Court, therefore, is not whether the State of Georgia can impose the Prompt Pay Statute's requirements on TPAs but whether the State can regulate the function governed by the Prompt Pay Statute as applied to self-funded ERISA plans.  To evaluate this

As discussed above, Section 6 of IDEA creates new Code Section 59.14. See IDEA § 6, 2011 Ga. Laws at 599–600 (adding O.C.G.A. § 33-24-59.14).  The substantive requirements of Section 59.14 are identical to those of Section 59.5. Compare id. § 5, 2011 Ga. Laws at 598–99 (amending O.C.G.A. § 33-24-59.5(b)–(d)), with id. § 6, 2011 Ga. Laws at 599–600 (adding O.C.G.A. § 33-24-59.14(b)–(d)).  Section 59.14 differs from Section 59.5 in that Section 59.14 imposes its requirements on both "insurers" and "administrators."  See id. § 6, 2011 Ga. Laws at 599–600 (adding O.C.G.A. § 33-24-59.14(b)(1)).  The effect of Section 59.14 is the same as Section 59.5, however, because Section 59.14's definition of "administrator" is wholly encompassed within Section 59.5's definition of "insurer."  Compare id. § 5, 2011 Ga. Laws at 598 (amending O.C.G.A. § 33-24-59.5(a)(3)) (defining "insurer" to include "any other administrator as defined in . . . Code Section 33-23-100") with id. § 6, 2011 Ga. Laws at 599 (adding O.C.G.A. § 33-24-59.14(a)(1)) (defining "administrator" as "hav[ing] the same meaning as provided in Code Section 33-23-100").[22]  Thus, although it is not clear to the Court

question, the Court considers whether the IDEA amendments "relate to" ERISA, as discussed below.

[22] Unlike Section 59.5, Section 59.14's requirements do not expressly apply to "any self-insured health benefit plan" (because that term is not included in Section 59.14's definition of "insurer").  Compare IDEA § 5, 2011 Ga. Laws at 598 (amending O.C.G.A. § 33-24-59.5(a)(3)), with id. § 6, 2011 Ga. Laws at 599

why Section 6 of IDEA creates Section 59.14, the Court finds that, like Section 5,

Section 6 of IDEA also imposes the Prompt Pay Statute's requirements on ERISA-

regulated self-funded health plans, TPAs of such plans, and any other entity

involved in the payment and benefit determination process.  IDEA is not confined

to the regulation of TPAs of self-funded plans.

### b.  Express Preemption by Section 514 of ERISA

Section 514(a) of ERISA, an express preemption provision, states that the

provisions of ERISA "shall supersede any and all State laws insofar as they may

now or hereafter relate to any [ERISA] employee benefit plan."  29 U.S.C.

§ 1144(a) (2006).  The broad preemptive effect of Section 514(a) is limited,

somewhat, by the so-called "Saving Clause" of Section 514(b), which provides that

"nothing in this subchapter shall be construed to exempt or relieve any person from

any law of any State which regulates insurance, banking, or securities."  Id.

§ 1144(b)(2)(A).  The Saving Clause, in turn, is tempered by the so-called

"Deemer Clause," which provides, in pertinent part, that an ERISA employee

---

(adding O.C.G.A. § 33-24-59.14(a)(6)).  But, like Section 59.5, Section 59.14 does apply to an entity that "provides for the financing or delivery of health care services through a health benefit plan."  See id. § 6, 2011 Ga. Laws at 599 (adding O.C.G.A. § 33-24-59.14(a)(6)).  The parties do not appear to argue that Section 59.14 applies to different entities than does Section 59.5, and neither party attempts to explain whether there is a substantive difference between Sections 59.5 and 59.14.

benefit plan "shall [not] be deemed to be an insurance company or other insurer . . .

or to be engaged in the business of insurance . . . for purposes of any law of any

State purporting to regulate insurance companies [or] insurance contracts." Id.

§ 1144(b)(2)(B).

The Supreme Court succinctly explained the relationship among these three

statutory provisions:

> To summarize the pure mechanics of the provisions quoted above: If a state law "relate[s] to . . . employee benefit plan[s]," it is pre-empted. § 514(a). The saving clause excepts from the pre-emption clause laws that "regulat[e] insurance." § 514(b)(2)(A). The deemer clause makes clear that a state law that "purport[s] to regulate insurance" cannot deem an employee benefit plan to be an insurance company. § 514(b)(2)(B).

Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 45 (1987) (alterations in original).  A

court analyzing whether a state law is expressly preempted under Section 514 of

ERISA must first determine whether the state law "relates to" employee benefit

plans.  If it does, the court then must determine if the law is saved from preemption

by the Saving Clause.  If it is not, the law is preempted.  If it is, the court must then

determine whether the law is denied its Saving Clause protection by the Deemer

Clause.  If it is, the law is preempted.  See FMC Corp. v. Holliday, 498 U.S. 52,

57–58 (1990); Pilot Life, 481 U.S. at 45; Metro. Life Ins. Co. v. Massachusetts,

471 U.S. 724, 739–41 (1985).

AHIP argues that the challenged provisions of IDEA "relate to" ERISA plans.  AHIP further argues that the IDEA provisions are not saved by the Saving Clause or, alternatively, that, if the Saving Clause applies, the Deemer Clause applies to preempt the provisions.  The Commissioner argues that the challenged provisions do not "relate to" ERISA plans.  But if they do, he argues that the Saving Clause applies and that the Deemer Clause does not.

i.   *Whether the Prompt Pay Statute "relates to" ERISA plans*

The parties agree that self-funded employer health plans are "employee benefit plans" subject to Section 514(a).  The issue here is whether the challenged provisions of IDEA "relate to" such plans.  The specific question is whether the payment timing decisions made by Prompt Pay Statute "insurers," including TPAs and other plan administrators, "relate to" ERISA self-funded plans such that regulation of them is preempted.

The Supreme Court consistently has observed that "relate to" is a "broadly worded provision" that is "clearly expansive," but that the term "cannot be taken to extend to the furthest stretch of its indeterminacy, or else for all practical purposes pre-emption would never run its course."  Egelhoff v. Egelhoff, 532 U.S. 141, 146 (2001) (internal quotation omitted) (quoting N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co., 514 U.S. 645, 655 (1995)).  The Court

33

repeatedly has held that a state law "relates to" an ERISA plan "if it has a connection with or reference to such a plan." E.g., id. at 147 (quoting Shaw, 463 U.S. at 97).[23]

　　　"To determine whether a state law has the forbidden connection," the Supreme Court has instructed courts to "look both to the objectives of the ERISA statute as a guide to the scope of the state law that would survive, as well as to the nature of the effect of the state law on ERISA plans." Egelhoff, 532 U.S. at 147 (quoting Dillingham, 519 U.S. at 325) (internal quotation marks omitted).  A state law that governs a "central matter of plan administration" or "interferes with nationally uniform plan administration" has an impermissible "connection."  Id. at 147–48; cf. Branche v.AirTran Airways, Inc., 342 F.3d 1248, 1255 (11th Cir. 2003) (reviewing the Supreme Court's ERISA cases to construe the identically-worded preemption provision of the Airline Deregulation Act and recognizing that a state law has a "connection with" the Act if it has a "sufficient—i.e.,

---

[23] On multiple occasions, Justice Scalia has urged the Supreme Court to abandon the "connection with" and "reference to" tests that have been read into Section 514 in favor of a traditional field preemption analysis.  See Egelhoff, 532 U.S. at 152–53 (Scalia, J., concurring); Dillingham, 519 U.S. at 336 (Scalia, J., concurring). This Court agrees that adopting a field preemption analysis could greatly simplify the evaluation of ERISA preemption claims but acknowledges that the Supreme Court has retained the "connection with" and "reference to" tests, and the Court evaluates AHIP's claim under these tests.

significant—impact" on the services regulated by the Act).  This is so because a "principal goal[] of ERISA is to enable employers 'to establish a uniform administrative scheme, which provides a set of standard procedures to guide processing of claims and disbursement of benefits.'  Uniformity is impossible, however, if plans are subject to different legal obligations in different States." Egelhoff, 532 U.S. at 148 (citations omitted) (quoting Fort Halifax Packing Co. v. Coyne, 482 U.S. 1, 9 (1987)).

In Egelhoff, the Supreme Court found a "connection" with ERISA plans where a state law provided that the designation of a spouse as the beneficiary of a non-probate asset would be revoked automatically upon divorce.  532 U.S. at 143. The Court determined that, when applied to ERISA plans, the law purported to govern the payment of plan benefits, which is a "central matter of plan administration."  Id. at 147–48.  The Court further found that, to comply with the law at issue and similar laws of any other state, ERISA plan administrators would be required to "familiarize themselves with state statutes so that they can determine whether the named beneficiary's status has been 'revoked' by operation of law." Id. at 148–49.  The Court held that such a requirement interfered with "nationally uniform plan administration" and "undermine[d] the congressional goal of 'minimiz[ing] the administrative and financial burden[s]' on plan administrators—

burdens ultimately borne by the beneficiaries." Id. at 148, 149–50 (second and third alterations in original) (quoting Ingersoll-Rand, 498 U.S. at 142).

In FMC, the Court held that a state antisubrogation statute, prohibiting health insurers and plans from recouping expenditures from beneficiaries' tort recoveries, had a "connection" with ERISA plans. 498 U.S. at 59–60. The Court found that subjecting ERISA plans to varying antisubrogation schemes would require plan administrators to calculate benefit levels differently state-by-state, which would in turn frustrate nationwide uniformity of plan administration. Id. at 60.

In De Buono, the Court held that a generally-applicable tax on hospital receipts, including those of hospitals owned by ERISA plans, did not have a "connection" with the plans. See 520 U.S. at 809, 814–15. The tax affected the cost of an available benefit scheme (i.e., the operation of a hospital), but it did not require or prohibit any particular benefit scheme, specific types of benefits, or methods of calculating benefits. Id. at 815–16. Similarly, in Dillingham, the Court held that a state law allowing construction companies to pay below-market wages to apprentices in state-authorized apprenticeship programs, including programs qualifying as ERISA plans, did not have a "connection" with the plans. 519 U.S. at 328–34. The Court found that the state law provided an incentive for ERISA

apprenticeship programs to become state-authorized (to allow the sponsoring employers to pay lower wages), but that the law did not require any programs to become state-authorized or impose any other requirements on the programs.  Id. at 332–34.  The Court explained that a state law lacks an impermissible "connection" with ERISA plans when it "alters the incentives, but does not dictate the choices, facing ERISA plans."  Id. at 334.

These cases show that a state law has a "connection with" ERISA plans when the law affects national uniformity of benefits determinations and claims, but not when it merely impacts the costs of providing certain benefits.  The Prompt Pay Statute, as amended by IDEA, requires health plans, including ERISA plans, to process and to pay provider claims, or to send notices denying the claims, within 15 or 30 days, depending on whether the claim is submitted electronically or in paper.  Although not explicit, the statute necessarily requires that benefit eligibility determinations (i.e., determinations as to whether the claim is covered) also be made within 15 or 30 days, in time to satisfy the payment or notice timing requirement.  These requirements, when applied to ERISA plans, have at least a "connection" with the plans.  These requirements, while not "alter[ing] the incentives" for ERISA plans to pursue certain actions, do compel certain action— "prompt" benefit determinations and payments—by plans and their administrators.

37

Cf. Dillingham, 519 U.S. at 334.  The payment or denial of plan benefits, and the timing of these activities, is a, if not the, "central matter of plan administration."[24] See Egelhoff, 532 U.S. at 147–48.  As with the state-prescribed beneficiary designations at issue in Egelhoff, the existence of state-by-state requirements for deciding and paying medical claims also interferes with nationally uniform administration of ERISA plans.[25]  See id. at 148.  This interference has the

---

[24] At the hearing on the pending motions, the Commissioner characterized the Prompt Pay Statute's requirements as ministerial and thus capable of regulation by the state.  (See, e.g., Tr. [44] at 50:6–8 ("The state doesn't think [the statute is] really burdensome.  It's basically—it's a keystroke.  That's basically what it is.").)  The Commissioner suggests a "ministerial activity" exception to the "connection with" preemption test but does not cite authority for the exception.  No evidence was presented that the deadlines imposed by IDEA are not burdensome or costly, or that they constitute a simple, ministerial cost compliance requirement.  Finally, to establish a "ministerial activity" exception could lead to the enactment of other "ministerial" regulations that would have the potential for further disrupting the national uniformity intended by Congress in enacting ERISA.

[25] To say that the imposition of state prompt pay legislation on ERISA plans would "interfere" with uniformity may, in fact, be an understatement.  One commentator, writing in 2007, summarized the then-existing patchwork of prompt pay legislation as follows:

> Three states, including Georgia, have strict provisions requiring that insurers pay claims in as little as 15 days, while South Carolina stands alone in allowing up to 60 days.  However, 18 states and the District of Columbia require that "clean" claims be paid within 30 days, while ten states demand that payment be made within 45 days.  Seven states distinguish between electronically submitted claims, which must be paid within 45 days, and paper claims, which must be paid within 30 days. Virginia provides 40 days, and West Virginia allows 40 days

potential to "produc[e] inefficiencies that employers might offset with decreased benefits."[26]  See FMC, 498 U.S. at 60.  The Court concludes that the challenged provisions of IDEA have a "connection with," and therefore "relate to," ERISA plans and are preempted under Section 514(a) of ERISA.[27]

---

upon manual submission of a claim and 30 days on an electronic claim, while Hawaii permits 30 days for paper claims and 15 days for electronic claims.  Tennessee provides 30 days for paper claims and 21 days for electronic claims.  New Hampshire gives 45 days for a paper claim and 15 days on electronic claims, and Louisiana allows 45 days for in-network claims if submitted within 45 days of rendering service, 60 days for in network claims submitted after 45 days from the time of service, 30 days for out of network claims, and 25 days for electronic claims. New Jersey and Rhode Island provide 30 days on paper claims and 40 days on electronic claims.  Mississippi provides 25 days on electronic claims and 35 days on paper claims.

Flynn, *supra*, at 403–04 (footnotes omitted).

[26] The ability to withhold payments for long periods of time certainly benefits plans by allowing them to earn income on the unpaid funds.  See Flynn, *supra*, at 400.  Whether plans should be able to take advantage of funds owed to providers is not for the Court to remedy in this action.  Cf. Guidry v. Sheet Metal Workers Nat'l Pension Fund, 493 U.S. 365, 376–77 (1990) (instructing that courts may not create "equitable" exceptions to harsh ERISA policies because "it is for Congress to undertake that task").

[27] Because the Court concludes that IDEA has a "connection with" ERISA plans, an inquiry into whether IDEA has a "reference to" ERISA plans is not necessary.  The Court notes, however, that IDEA does not satisfy the most recent articulations of the "reference to" test.  In earlier cases, the Supreme Court characterized the "reference to" inquiry broadly.  See, e.g., FMC, 498 U.S. at 59 (holding that a state statute that encompassed ERISA plans had a "reference to" the plans).  In later cases the Court clarified that a state law has a "reference to" ERISA plans, and

ii. *Whether the Saving and Deemer Clauses apply*

Having concluded that IDEA falls within the general preemption provision

of Section 514(a), the Court considers whether the Saving Clause, in Section

"relates to" plans on that basis, only when the law "acts immediately and exclusively upon ERISA plans" or when "the existence of ERISA plans is essential to the law's operation." See Cal. Div. of Labor Standards Enforcement v. Dillingham Constr., N.A., Inc., 519 U.S. 316, 325 (1997); see also De Buono v. NYSA-ILA Med. & Clinical Servs. Fund, 520 U.S. 806, 815 & nn.14–15 (1997). Under this standard, the Supreme Court has held that state laws premised on the existence of ERISA plans have a "reference to," and therefore "relate to," the plans. See District of Columbia v. Greater Wash. Bd. of Trade, 506 U.S. 125, 127–130 (1992) (holding that a local law, requiring employers to continue to offer health insurance to employees receiving workers' compensation benefits, had a "reference to" ERISA plans because employer-offered health insurance is necessarily part of an ERISA plan and the law, therefore, was premised on the existence of an ERISA plan); Ingersoll-Rand Co. v. McClendon, 498 U.S. 133, 139–40 (1990) (holding that a state law claim, brought by an employee who was terminated because of the employer's desire to avoid paying pension benefits, was preempted because an element of the state cause of action was whether an ERISA-regulated pension plan existed and the state law claim therefore had a "reference" to ERISA). By contrast, a state law of general applicability that operates "irrespective of the existence of an ERISA plan" does not have a "reference to" the plans. See Dillingham, 519 U.S. at 325–28 (holding that a state law, allowing construction companies to pay below-market wages only to apprentices enrolled in state-authorized apprenticeship programs, was not preempted because, even though some apprenticeship programs are ERISA plans, the state law was applied equally to ERISA- and non-ERISA apprenticeship programs). The provisions of IDEA at issue here change the Prompt Pay Statute to apply to payments from all health plans: ERISA-regulated insured plans, ERISA-regulated self-funded plans, *and* non-ERISA-regulated (i.e., non-employer-based) insurance products. The amended Prompt Pay Statute functions "irrespective of the existence of an ERISA plan." See id. at 328. It is "indifferent to the funding, and attendant ERISA coverage, of" the plans and insurance policies to which it applies. See id. Accordingly, the "reference to" test for determining whether IDEA "relates to" ERISA plans likely does not apply.

514(b)(2)(A), and the Deemer Clause, in Section 514(b)(2)(B), apply.  If the

Saving Clause applies and the Deemer Clause does not, IDEA is not preempted.  If

both Clauses apply, it is.  See FMC, 498 U.S. at 58.

The Saving Clause exempts from Section 514(a) preemption a state law that

"regulates insurance."  29 U.S.C. § 1144(b)(2)(A).  It applies when (1) the state

law is "specifically directed toward entities engaged in insurance" and (2) the state

law "substantially affect[s] the risk pooling arrangement between the insurer and

the insured."  Ky. Ass'n of Health Plans, Inc. v. Miller, 538 U.S. 329, 341–42

(2003).  To be "engaged in insurance," an entity need not be an insurance company

but must simply "engage in the same sort of risk pooling arrangements" as

insurers.  Id. at 336 n.1.  Self-funded employee health plans are, under this

definition, "engaged in insurance."  Id.

The IDEA provisions at issue, which apply to all health plans and insurance

policies, are "directed toward entities engaged in insurance."  See id.  The Court

also finds that IDEA "substantially affects the risk pooling arrangement between

the insurer and the insured" because the Act, applying equally to claims for

payment by providers and claims for reimbursement by beneficiaries, imposes a

timeliness requirement onto the agreement between the insurer, or plan, and the

41

insured, or beneficiary.[28]  See FMC, 498 U.S. at 60–61.  The Saving Clause,

therefore, applies to IDEA.  See id.

The Deemer Clause provides that an ERISA plan "shall [not] be deemed . . .

to be engaged in the business of insurance . . . for purposes of any law of any State

purporting to regulate insurance companies."  29 U.S.C. § 1144(b)(2)(B).  This

means that, while a state law can regulate insurance or the business of insurance

under the Saving Clause, the law cannot directly regulate ERISA plans.  See FMC,

498 U.S. at 61 ("State laws that directly regulate insurance are 'saved' but do not

reach self-funded employee benefit plans because the plans may not be deemed to

be insurance companies, other insurers, or engaged in the business of insurance for

purposes of such state laws.");  see also Metro. Life, 471 U.S. at 740–41

(explaining that while the Saving Clause applies to all "laws that regulate

---

[28] Relying on Ellis, AHIP argues that the Saving Clause does not apply to IDEA
because the Act is "remedial."  In Ellis, the Fifth Circuit considered state statutes
prohibiting "unfair practices" and "unfair" claims processing by insurance
companies and affording consumers a civil action for violations.  394 F.3d at 274–
75.  The court found that the statutes were "remedial" in that they offered remedies
for "bad faith" by insurers.  Id. at 277.  On that basis, the court held that the
statutes did not affect the bargain between insurer and insured and, therefore, did
not fall within the ambit of the Saving Clause.  Id.  The IDEA provisions here are
not "remedial."  IDEA does not simply afford remedies for insurer "bad faith" but
imposes specific requirements on insurers and administrators in processing
insureds' and beneficiaries' claims.  Moreover, the requirements of the Prompt Pay
Statute are expressly required to be included as terms in health insurance policies.
See O.C.G.A. § 33-29-3(b)(8) (2005).

insurance contracts," the purpose of the Deemer Clause is "explicitly to exempt such laws from the saving clause when they are applied directly to benefit plans"). The practical effect of the Saving and Deemer Clauses is that a state law may regulate insured ERISA plans, by regulating the insurance policies that the plans purchase, but it may not regulate self-funded plans, which do not purchase insurance and which cannot be "deemed" to be insurers for purposes of the law. FMC, 498 U.S. at 61. The Saving and Deemer Clauses result in the curious—even unfair—disparate treatment of self-funded and insured ERISA plans, the latter being capable of some state regulation and the former being free of nearly all state oversight. The Supreme Court has recognized this disparity on multiple occasions reasoning that Congress intended to allow it. Metro. Life, 471 U.S. at 747 ("We are aware that our decision results in a distinction between insured and uninsured plans, leaving the former open to indirect regulation while the latter are not. By so doing we merely give life to a distinction created by Congress in the 'deemer clause,' a distinction Congress is aware of and one it has chosen not to alter."); accord FMC, 498 U.S. at 62; Mullenix v. Aetna Life & Cas. Ins. Co., 912 F.2d 1406, 1409 (11th Cir. 1990). Any disparity created in the treatment of self-funded and insured ERISA plans is a matter that Congress is required to address.

The application of the Deemer Clause to IDEA is straightforward.  The Act imposes the Prompt Pay Statute's requirements directly on all health plans, insured and self-funded alike.  The imposition of the requirements on insured plans is permitted under the Saving Clause.  The imposition of the requirements on self-funded plans is prohibited under the Deemer Clause.  The Court concludes that the challenged provisions of IDEA—those which extend the requirements of the Prompt Pay Statute to self-funded plans—are expressly preempted by Section 514 of ERISA.  For this reason, the Commissioner's Motion to Dismiss on the ground that IDEA is not preempted is required to be denied.

        c.   Conflict Preemption by Labor Regulations and by ERISA's Civil Enforcement Provisions

In addition to "express preemption" under Section 514, AHIP alternatively contends that the challenged provisions of IDEA are preempted under principles of "conflict preemption."  AHIP argues that an ERISA regulation promulgated by the Department of Labor, 29 C.F.R. § 2560.503-1(f)(2)(iii)(B), conflicts with the requirements of the amended Prompt Pay Statute.  AHIP further argues that Section 502(a) of ERISA, which provides civil enforcement remedies, preempts the application of the amended Prompt Pay Statute.  Because the Court concludes that the challenged IDEA provisions are "expressly" preempted, the Court does not

reach AHIP's alternative arguments for preemption, under either the regulation[29] or

Section 502.[30]

_____

[29] The Court notes that the Labor regulation cited by AHIP does not appear to conflict with the challenged provisions of IDEA.  "Conflict preemption" generally applies either when it is impossible to comply with both the state and federal laws or when the state law stands as an obstacle to the objective of the federal law. Alabama, 691 F.3d at 1281.  The Labor regulation here provides that it "shall [not] be construed to supersede any provision of State law that regulates insurance, except to the extent that such law prevents the application of a requirement of this section."  See 29 C.F.R. § 2560.503-1(k)(1) (2010).  By the regulation's terms, the conflict preemption inquiry is limited to whether the state law prevents compliance with the regulation.  The regulation requires a plan administrator to notify a claimant of an adverse benefit determination "within a reasonable period of time, but not later than 30 days after receipt of the claim."  Id. § 2560.503-1(f)(2)(iii)(B). The regulation also allows for a 15-day extension in certain circumstances.  Id. The amended Prompt Pay Statute requires an "insurer" to send, within 15 or 30 working days of receiving a claim, a "notice which states the reasons the insurer may have for failing to pay the claim."  IDEA § 5 (amending O.C.G.A. § 33-24-59.5(b)(1)).  By submitting denial notices within 15 (or 30) business days, a Georgia TPA can comply with both the Prompt Pay Statute and the regulation.  Cf. Farina v. Nokia Inc., 625 F.3d 97, 122 (3d Cir. 2010) (noting that compliance with both a federal standard and a stricter state standard is "possible" for conflict preemption purposes).

[30] The Court notes that Section 502(a) generally is not a source of "conflict preemption."  See Conn. State Dental Ass'n v. Anthem Health Plans, Inc., 591 F.3d 1337, 1344 (11th Cir. 2009).  Section 502(a) creates civil enforcement actions.  See 29 U.S.C. § 1132(a) (2006 & Supp. IV 2010).  It is a source of "complete preemption" of state law causes of action and, on that basis, confers federal courts with removal jurisdiction over such preempted actions.  See Conn. State Dental Ass'n, 591 F.3d at 1344  ("Conflict preemption, also known as defensive preemption, is a substantive defense to preempted state law claims. . . . Complete preemption . . . is a judicially-recognized exception to the well-pleaded complaint rule.  It differs from defensive preemption because it is jurisdictional in nature rather than an affirmative defense.").  This case presents a direct challenge

### III.   AHIP'S MOTION FOR PRELIMINARY INJUNCTION

A.   Legal Standard

To be eligible for a preliminary injunction under Rule 65 of the Federal Rules of Civil Procedure, a movant must show: (1) a substantial likelihood of prevailing on the merits; (2) that the movant will suffer irreparable injury if the relief is not granted; (3) that the threatened injury outweighs the harm the relief would inflict on the opposing party; and (4) that if granted, the injunction would not be adverse to the public interest.  See Schiavo ex rel. Schindler v. Schiavo, 403 F.3d 1223, 1225–26 (11th Cir. 2005); Parker v. State Bd. of Pardons & Paroles, 275 F.3d 1032, 1034–35 (11th Cir. 2001); Baker v. Buckeye Cellulose Corp., 856 F.2d 167, 169 (11th Cir. 1995).  Preliminary injunctive relief is a drastic and extraordinary remedy which should not be granted unless the movant can clearly establish each of the four elements.  Four Seasons Hotels & Resorts, B.V. v. Consorcio Barr, S.A., 320 F.3d 1205, 1210 (11th Cir. 2003) (quoting McDonald's Corp. v. Robertson, 147 F.3d 1301, 1306 (11th Cir. 1998)).  "The burden of persuasion on all of the four requirements is at all times upon the plaintiff."  Canal Auth. of Fla. v. Calloway, 489 F.2d 567, 573 (5th Cir. 1974).

---

to the validity of a state law, not a state law claim alleged to be preempted by ERISA.

B.    <u>Analysis</u>

AHIP argues that its claim, seeking the invalidation of the challenged provisions of IDEA, will be successful on the merits because, as a matter of law, ERISA preempts the challenged provisions.  For the reasons fully explained above, the Court agrees.  ERISA preempts the challenged provisions of IDEA, and AHIP is therefore likely to succeed on the merits of its claim.

To determine whether a preliminary injunction is appropriate, the Court considers the remaining equitable factors: whether AHIP's members will suffer irreparable injury without an injunction, whether the threatened injury outweighs the harm an injunction would inflict on the Commissioner, and the effect of an injunction on the public interest.  <u>See</u> <u>Schiavo</u>, 403 F.3d at 1225–26.

The Court concludes that AHIP's members will suffer irreparable injury if Sections 4, 5, and 6 of IDEA are permitted to take effect.  To comply with the law, AHIP's members will be required to incur the costs and burdens, including increased employee time, of modifying their claims processing systems, of monitoring compliance, and of preparing quarterly reports to Georgia regulators. (AHIP's Ex. 3 [4-4] ¶¶ 8–14.)  To ignore the law, AHIP's members face the imposition not only of 12 percent interest on "late" payments but also of penalties imposed by the Commissioner, who has publicly announced that he intends to

enforce the law.  (Id.; AHIP's Ex. A [28-1] at 3.)  Absent an injunction, AHIP's

members will be forced either to incur the costs of compliance with a preempted

state law or to face the possibility of penalties.  See Morales v. Trans World

Airlines, Inc., 504 U.S. 374, 381 (1992) (holding that a plaintiff would suffer

"irreparable harm" if forced to choose to incur either the civil enforcement liability

of violating a preempted state law or the costs of complying with the law during

the pendency of the proceedings); Ga. Latino Alliance for Human Rights v.

Governor of Ga., 691 F.3d 1250, 1268–69 (11th Cir. 2012) (recognizing that a

plaintiff faces "irreparable harm" for purposes of a preliminary injunction when it

is "under the threat of state prosecution for crimes that conflict with federal law").

There also is no mechanism to allow AHIP's members to recover any costs or

penalties paid in the event that enforcement of the challenged IDEA provisions is

ultimately permanently enjoined.  See Bankwest, Inc. v. Baker, 324 F. Supp. 2d

1333, (N.D. Ga. 2004) (citing Bank of Am., N.A. v. Sorrell, 248 F. Supp. 2d 1196,

1199–1200 (N.D. Ga. 2002), vacated as moot, 446 F.3d 1358 (11th Cir. 2006))

(recognizing that a "threatened loss of revenue, which will not be recoverable,

constitutes irreparable harm"); see also Chamber of Commerce v. Edmondson, 594

F.3d 742, 770–71 (10th Cir. 2010) (citing Ohio Oil Co. v. Conway, 279 U.S. 813,

814 (1929)) ("Imposition of monetary damages that cannot later be recovered for reasons such as sovereign immunity constitutes irreparable injury.").

The Court also concludes that neither harm to the Commissioner nor the public interest weighs against a preliminary injunction.  The Court recognizes that IDEA passed by wide margins in the General Assembly—not once but twice—and that the extension of the Prompt Pay Statute enjoys broad legislative support.  Nevertheless, the challenged IDEA provisions are preempted by ERISA.  As a matter of law, therefore, the Commissioner cannot suffer harm from an injunction against the Act, and the public would be harmed by its enforcement.  See Trans World Airlines, Inc. v. Mattox, 897 F.2d 773, 784 (5th Cir. 1990) (holding that "there is no injury to the states to weigh" in the enjoining of a preempted law and that the public interest is necessarily served by enforcing a congressional intention that a state law be preempted); see also Cal. Pharmacists Ass'n v. Maxwell-Jolly, 563 F.3d 847, 852–53 (9th Cir. 2009) (holding that "the interest of preserving the Supremacy Clause is paramount" in weighing the effects of a preliminary injunction on the state and the public).

Having concluded that AHIP will likely succeed on the merits of its claim, that AHIP will suffer irreparable harm if the challenged IDEA provisions take effect, and that neither harm to the Commissioner nor the public interest counsel

against enjoining the provisions, the Court finds that AHIP's Motion for a Preliminary Injunction is required to be granted.

## IV.   CONCLUSION

Accordingly, for the foregoing reasons,

**IT IS HEREBY ORDERED** that Defendant's Motion to Dismiss Complaint [22] is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for a Preliminary Injunction [4] is **GRANTED**.  The Commissioner is **ENJOINED** from enforcing the provisions of Sections 4, 5, and 6 of the Insurance Delivery Enhancement Act of 2011 that apply to ERISA-regulated self-funded health plans and the administrators of them.

**SO ORDERED** this 31st day of December, 2012.

_____
WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE